*2439 Justice ALITO delivered the opinion of the Court.
*423 In this case, we decide a question left open in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), namely, who qualifies as a "supervisor" in a case in which an employee asserts a Title VII claim for workplace harassment?
*424 Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Id., at 807, 118 S.Ct. 2275; Ellerth, supra, at 765, 118 S.Ct. 2257. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.
We hold that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim, and we therefore affirm the judgment of the Seventh Circuit.
I
Maetta Vance, an African-American woman, began working for Ball State University (BSU) in 1989 as a substitute server in the University Banquet and Catering division of Dining Services. In 1991, BSU promoted Vance to a part-time catering assistant position, and in 2007 she applied and was selected for a position as a full-time catering assistant.
Over the course of her employment with BSU, Vance lodged numerous complaints of racial discrimination and retaliation, but most of those incidents are not at issue here. For present purposes, the only relevant incidents concern Vance's interactions with a fellow BSU employee, Saundra Davis.
During the time in question, Davis, a white woman, was employed as a catering specialist in the Banquet and Catering *425 division. The parties vigorously dispute the precise nature and scope of Davis' duties, but they agree that Davis did not have the power to hire, fire, demote, promote, transfer, or discipline Vance. See No. 1:06-cv-1452-SEB-JMS, 2008 WL 4247836, at *12 (S.D.Ind., Sept. 10, 2008) ("Vance makes no allegations that Ms. Davis possessed any such power"); Brief for Petitioner 9-11 (describing Davis' authority over Vance); Brief for Respondent 39 ("[A]ll agree that Davis lacked the authority to take tangible employments [sic ] actions against petitioner").
In late 2005 and early 2006, Vance filed internal complaints with BSU and charges with the Equal Employment Opportunity Commission (EEOC), alleging racial harassment and discrimination, and many of these complaints and charges pertained to Davis. 646 F.3d 461, 467 (C.A.7 2011). Vance complained that Davis "gave her a hard time at work by glaring at her, slamming pots and pans around her, and intimidating her." Ibid. She alleged that she was "left alone in the kitchen with Davis, who smiled at her"; that Davis "blocked"
*2440 her on an elevator and "stood there with her cart smiling"; and that Davis often gave her "weird" looks. Ibid. (internal quotation marks omitted).
Vance's workplace strife persisted despite BSU's attempts to address the problem. As a result, Vance filed this lawsuit in 2006 in the United States District Court for the Southern District of Indiana, claiming, among other things, that she had been subjected to a racially hostile work environment in violation of Title VII. In her complaint, she alleged that Davis was her supervisor and that BSU was liable for Davis' creation of a racially hostile work environment. Complaint in No. 1:06-cv-01452-SEB-TAB (SD Ind., Oct. 3, 2006), Dkt. No. 1, pp. 5-6.
Both parties moved for summary judgment, and the District Court entered summary judgment in favor of BSU. 2008 WL 4247836, at *1. The court explained that BSU could not be held vicariously liable for Davis' alleged racial harassment *426 because Davis could not " 'hire, fire, demote, promote, transfer, or discipline' " Vance and, as a result, was not Vance's supervisor under the Seventh Circuit's interpretation of that concept. See id., at *12 (quoting Hall v. Bodine Elect. Co., 276 F.3d 345, 355 (C.A.7 2002) ). The court further held that BSU could not be liable in negligence because it responded reasonably to the incidents of which it was aware. 2008 WL 4247836, *15.
The Seventh Circuit affirmed. 646 F.3d 461. It explained that, under its settled precedent, supervisor status requires " 'the power to hire, fire, demote, promote, transfer, or discipline an employee.' " Id., at 470 (quoting Hall,supra, at 355 ). The court concluded that Davis was not Vance's supervisor and thus that Vance could not recover from BSU unless she could prove negligence. Finding that BSU was not negligent with respect to Davis' conduct, the court affirmed. 646 F.3d, at 470-473.
II
A
Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This provision obviously prohibits discrimination with respect to employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts. But not long after Title VII was enacted, the lower courts held that Title VII also reaches the creation or perpetuation of a discriminatory work environment.
In the leading case of Rogers v. EEOC, 454 F.2d 234 (1971), the Fifth Circuit recognized a cause of action based on this theory. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (describing development of hostile *427 environment claims based on race). The Rogers court reasoned that "the phrase 'terms, conditions, or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." 454 F.2d, at 238. The court observed that "[o]ne can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." Ibid. Following this decision, the lower courts generally held that an employer was liable for a racially hostile work environment if the *2441 employer was negligent, i.e., if the employer knew or reasonably should have known about the harassment but failed to take remedial action. See Ellerth, 524 U.S., at 768-769, 118 S.Ct. 2257 (THOMAS, J., dissenting) (citing cases).
When the issue eventually reached this Court, we agreed that Title VII prohibits the creation of a hostile work environment. See Meritor, supra, at 64-67, 106 S.Ct. 2399. In such cases, we have held, the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered. See, e.g., Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
B
Consistent with Rogers, we have held that an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior. Faragher, 524 U.S., at 789, 118 S.Ct. 2275. Courts have generally applied this rule to evaluate employer liability when a co-worker harasses the plaintiff.[1]
*428 In Ellerth and Faragher, however, we held that different rules apply where the harassing employee is the plaintiff's "supervisor." In those instances, an employer may be vicariously liable for its employees' creation of a hostile work environment. And in identifying the situations in which such vicarious liability is appropriate, we looked to the Restatement of Agency for guidance. See, e.g., Meritor, supra, at 72, 106 S.Ct. 2399; Ellerth, supra, at 755, 118 S.Ct. 2257.
Under the Restatement, "masters" are generally not liable for the torts of their "servants" when the torts are committed outside the scope of the servants' employment. See 1 Restatement (Second) of Agency § 219(2), p. 481 (1957) (Restatement). And because racial and sexual harassment are unlikely to fall within the scope of a servant's duties, application of this rule would generally preclude employer liability for employee harassment. See Faragher, supra, at 793-796, 118 S.Ct. 2275; Ellerth, supra, at 757, 118 S.Ct. 2257. But in Ellerth and Faragher, we held that a provision of the Restatement provided the basis for an exception. Section 219(2)(d) of that Restatement recognizes an exception to the general rule just noted for situations in which the servant was "aided in accomplishing the tort by the existence of the agency relation."[2] Restatement 481; see Faragher,supra, at 802-803, 118 S.Ct. 2275; Ellerth, supra, at 760-763, 118 S.Ct. 2257.
Adapting this concept to the Title VII context, Ellerth and Faragher identified two situations in which the aided-in-the-accomplishment rule warrants employer liability even in the absence of negligence, and both of these situations involve *429 harassment by a "supervisor" as opposed to a co- *2442 worker. First, the Court held that an employer is vicariously liable "when a supervisor takes a tangible employment action," Ellerth, supra, at 762, 118 S.Ct. 2257; Faragher, supra, at 790, 118 S.Ct. 2275 -i.e., "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S., at 761, 118 S.Ct. 2257. We explained the reason for this rule as follows: "When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.... A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." Id., at 761-762, 118 S.Ct. 2257. In those circumstances, we said, it is appropriate to hold the employer strictly liable. See Faragher, supra, at 807, 118 S.Ct. 2275; Ellerth,supra, at 765, 118 S.Ct. 2257.
Second, Ellerth and Faragher held that, even when a supervisor's harassment does not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an affirmative defense.[3] We *430 began by noting that "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation." Ellerth, supra, at 763, 118 S.Ct. 2257; see Faragher, 524 U.S., at 803-805, 118 S.Ct. 2275. But it would go too far, we found, to make employers strictly liable whenever a "supervisor" engages in harassment that does not result in a tangible employment action, and we therefore held that in such cases the employer may raise an affirmative defense. Specifically, an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. Faragher, supra, at 807, 118 S.Ct. 2275; Ellerth, 524 U.S., at 765, 118 S.Ct. 2257. This compromise, we explained, "accommodate[s] the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees." Id., at 764, 118 S.Ct. 2257.
The dissenting Members of the Court in Ellerth and Faragher would not have created a special rule for cases involving harassment by "supervisors." Instead, they would have held that an employer is liable for any employee's creation of a hostile work environment "if, and only if, the plaintiff proves that the employer was *2443 negligent in permitting the [offending] conduct to occur." Ellerth,supra, at 767, 118 S.Ct. 2257 (THOMAS, J., dissenting); Faragher, supra, at 810, 118 S.Ct. 2275 (same).
C
Under Ellerth and Faragher, it is obviously important whether an alleged harasser is a "supervisor" or merely a co-worker, and the lower courts have disagreed about the meaning of the concept of a supervisor in this context. Some courts, including the Seventh Circuit below, have held *431 that an employee is not a supervisor unless he or she has the power to hire, fire, demote, promote, transfer, or discipline the victim. E.g., 646 F.3d, at 470 ; Noviello v. Boston, 398 F.3d 76, 96 (C.A.1 2005) ; Weyers v. Lear Operations Corp., 359 F.3d 1049, 1057 (C.A.8 2004). Other courts have substantially followed the more open-ended approach advocated by the EEOC's Enforcement Guidance, which ties supervisor status to the ability to exercise significant direction over another's daily work. See, e.g., Mack v. Otis Elevator Co., 326 F.3d 116, 126-127 (C.A.2 2003) ; Whitten v. Fred's, Inc., 601 F.3d 231, 245-247 (C.A.4 2010) ; EEOC, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (1999), 1999 WL 33305874, at *3 (hereinafter EEOC Guidance).
We granted certiorari to resolve this conflict. 567 U.S. ----, 133 S.Ct. 23, 183 L.Ed.2d 673 (2012).
III
We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, supra, at 761, 118 S.Ct. 2257. We reject the nebulous definition of a "supervisor" advocated in the EEOC Guidance[4] and substantially adopted by several courts of appeals. Petitioner's reliance *432 on colloquial uses of the term " supervisor" is misplaced, and her contention that our cases require the EEOC's abstract definition is simply wrong.
As we will explain, the framework set out in Ellerth and Faragher presupposes a clear distinction between supervisors and co-workers. Those decisions contemplate a unitary category of supervisors, i.e., those employees with the authority to make tangible employment decisions. There is no hint in either decision that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree. On the contrary, the Ellerth / Faragher framework is one under which supervisory status can usually be readily determined, generally by written documentation. The approach recommended by the EEOC Guidance, by contrast, would make the determination of supervisor status depend on a highly case-specific evaluation of numerous factors.
*2444 The Ellerth / Faragher framework represents what the Court saw as a workable compromise between the aided-in-the-accomplishment theory of vicarious liability and the legitimate interests of employers. The Seventh Circuit's understanding of the concept of a "supervisor," with which we agree, is easily workable; it can be applied without undue difficulty at both the summary judgment stage and at trial. The alternative, in many cases, would frustrate judges and confound jurors.
A
Petitioner contends that her expansive understanding of the concept of a "supervisor" is supported by the meaning of the word in general usage and in other legal contexts, see Brief for Petitioner 25-28, but this argument is both incorrect on its own terms and, in any event, misguided.
In general usage, the term "supervisor" lacks a sufficiently specific meaning to be helpful for present purposes. Petitioner is certainly right that the term is often used to refer *433 to a person who has the authority to direct another's work. See, e.g., 17 Oxford English Dictionary 245 (2d ed. 1989) (defining the term as applying to "one who inspects and directs the work of others"). But the term is also often closely tied to the authority to take what Ellerth and Faragher referred to as a "tangible employment action." See, e.g ., Webster's Third New International Dictionary 2296, def. 1(a) (1976) ("a person having authority delegated by an employer to hire, transfer, suspend, recall, promote, assign, or discharge another employee or to recommend such action").
A comparison of the definitions provided by two colloquial business authorities illustrates the term's imprecision in general usage. One says that "[s]upervisors are usually authorized to recommend and/or effect hiring, disciplining, promoting, punishing, rewarding, and other associated activities regarding the employees in their departments."[5] Another says exactly the opposite: "A supervisor generally does not have the power to hire or fire employees or to promote them."[6] Compare Ellerth, 524 U.S., at 762, 118 S.Ct. 2257 ("Tangible employment actions fall within the special province of the supervisor").
If we look beyond general usage to the meaning of the term in other legal contexts, we find much the same situation. Sometimes the term is reserved for those in the upper echelons of the management hierarchy. See, e.g., 25 U.S.C. § 2021(18) (defining the "supervisor" of a school within the jurisdiction of the Bureau of Indian Affairs as "the individual in the position of ultimate authority at a Bureau school"). But sometimes the term is used to refer to lower ranking individuals. See, e.g., 29 U.S.C. § 152(11) (defining a supervisor to include "any individual having authority ... to hire, *434 transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment"); 42 U.S.C. § 1396n(j)(4)(A) (providing that an eligible Medicaid beneficiary who receives care through an approved self-directed services plan may "hire, fire, supervise, and manage the individuals providing such services"). *2445 Although the meaning of the concept of a supervisor varies from one legal context to another, the law often contemplates that the ability to supervise includes the ability to take tangible employment actions.[7] See, e.g., *435 5 CFR §§ 9701.511(a)(2), (3) (2012) (referring to a supervisor's authority to "hire, assign, and direct employees ... and [t]o lay off and retain employees, or to suspend, remove, reduce in grade, band, or pay, or take other disciplinary action against such employees or, with respect to filling positions, to make selections for appointments from properly ranked and certified candidates for promotion or from any other appropriate source"); § 9701.212(b)(4) (defining "supervisory work" as that which "may involve hiring or selecting employees, assigning *2446 work, managing performance, recognizing and rewarding employees, and other associated duties"). *436 In sum, the term "supervisor" has varying meanings both in colloquial usage and in the law. And for this reason, petitioner's argument, taken on its own terms, is unsuccessful.
More important, petitioner is misguided in suggesting that we should approach the question presented here as if "supervisor" were a statutory term. "Supervisor" is not a term used by Congress in Title VII. Rather, the term was adopted by this Court in Ellerth and Faragher as a label for the class of employees whose misconduct may give rise to vicarious employer liability. Accordingly, the way to understand the meaning of the term "supervisor" for present purposes is to consider the interpretation that best fits within the highly structured framework that those cases adopted.
B
In considering Ellerth and Faragher , we are met at the outset with petitioner's contention that at least some of the alleged harassers in those cases, whom we treated as supervisors, lacked the authority that the Seventh Circuit's definition demands. This argument misreads our decisions.
In Ellerth, it was clear that the alleged harasser was a supervisor under any definition of the term: He hired his victim, and he promoted her (subject only to the ministerial approval of his supervisor, who merely signed the paperwork). 524 U.S., at 747, 118 S.Ct. 2257.Ellerth was a case from the Seventh Circuit, and at the time of its decision in that case, that court had already adopted its current definition of a supervisor. See Volk v. Coler, 845 F.2d 1422, 1436 (1988). See also Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1033, n. 1 (C.A.7 1998) (discussing Circuit case law). Although the en banc Seventh Circuit in Ellerth issued eight separate opinions, there was no disagreement about the harasser's status as a supervisor. Jansen v. Packaging Corp. of America, 123 F.3d 490 (1997) (per curiam ). Likewise, when the case reached this Court, no question about the harasser's status was raised.
*437 The same is true with respect to Faragher . In that case, Faragher, a female lifeguard, sued her employer, the city of Boca Raton, for sexual harassment based on the conduct of two other lifeguards, Bill Terry and David Silverman, and we held that the city was vicariously liable for Terry's and Silverman's harassment. Although it is clear that Terry had authority to take tangible employment actions affecting the victim,[8] see 524 U.S., at 781, 118 S.Ct. 2275 (explaining that Terry could hire new lifeguards, supervise their work assignments, counsel, and discipline them), Silverman may have wielded less authority, ibid. (noting that Silverman was " responsible for making the lifeguards' daily assignments, and for supervising their *2447 work and fitness training"). Nevertheless, the city never disputed Faragher's characterization of both men as her "supervisors." See App., O.T. 1997, No. 97-282, p. 40 (First Amended Complaint ¶¶ 6-7); id ., at 79 (Answer to First Amended Complaint ¶¶ 6-7) (admitting that both harassers had "supervisory responsibilities" over the plaintiff).[9] *438 In light of the parties' undisputed characterization of the alleged harassers, this Court simply was not presented with the question of the degree of authority that an employee must have in order to be classified as a supervisor.[10] The parties did not focus on the issue in their briefs, although the victim in Faragher appears to have agreed that supervisors are employees empowered to take tangible employment actions. See Brief for Petitioner, O.T. 1997, No. 97-282, p. 24 ("Supervisors typically exercise broad discretionary powers over their subordinates, determining many of the terms and conditions of their employment, including their raises and prospects for promotion and controlling or greatly influencing whether they are to be dismissed").
For these reasons, we have no difficulty rejecting petitioner's argument that the question before us in the present case was effectively settled in her favor by our treatment of the alleged harassers in Ellerth and Faragher .[11]
*439 The dissent acknowledges that our prior cases do "not squarely resolve whether an employee without power to take tangible employment actions may nonetheless qualify as a supervisor," but accuses us of ignoring the "all-too-plain reality" that employees with authority to control their subordinates' daily work are aided by that authority in perpetuating a discriminatory work environment. Post, at 2458 - 2459 (opinion of GINSBURG, J.). As Ellerth recognized, however, "most workplace *2448 tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation," and consequently "something more" is required in order to warrant vicarious liability. 524 U.S., at 760, 118 S.Ct. 2257. The ability to direct another employee's tasks is simply not sufficient. Employees with such powers are certainly capable of creating intolerable work environments, see post, at 2459 - 2460 (discussing examples), but so are many other co-workers. Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions.
C
Although our holdings in Faragher and Ellerth do not resolve the question now before us, we believe that the answer to that question is implicit in the characteristics of the framework that we adopted.
To begin, there is no hint in either Ellerth or Faragher that the Court contemplated anything other than a unitary category of supervisors, namely, those possessing the authority to effect a tangible change in a victim's terms or conditions of employment. The Ellerth / Faragher framework draws a sharp line between co-workers and supervisors. Co-workers, the Court noted, "can inflict psychological injuries" by creating a hostile work environment, but they "cannot dock another's pay, nor can one co-worker demote *440 another." Ellerth, 524 U.S., at 762, 118 S.Ct. 2257. Only a supervisor has the power to cause "direct economic harm" by taking a tangible employment action. Ibid . "Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.... Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." Ibid . (emphasis added). The strong implication of this passage is that the authority to take tangible employment actions is the defining characteristic of a supervisor, not simply a characteristic of a subset of an ill-defined class of employees who qualify as supervisors.
The way in which we framed the question presented in Ellerth supports this understanding. As noted, the Ellerth / Faragher framework sets out two circumstances in which an employer may be vicariously liable for a supervisor's harassment. The first situation (which results in strict liability) exists when a supervisor actually takes a tangible employment action based on, for example, a subordinate's refusal to accede to sexual demands. The second situation (which results in vicarious liability if the employer cannot make out the requisite affirmative defense) is present when no such tangible action is taken. Both Ellerth and Faragher fell into the second category, and in Ellerth, the Court couched the question at issue in the following terms: "whether an employer has vicarious liability when a supervisor creates a hostile work environment by making explicit threats to alter a subordinate's terms or conditions of employment, based on sex, but does not fulfill the threat." 524 U.S., at 754, 118 S.Ct. 2257. This statement plainly ties the second situation to a supervisor's authority to inflict direct economic injury. It is because a supervisor has that authority-and its potential use hangs as a threat over the victim-that vicarious liability (subject to the affirmative defense) is justified.
*2449 *441 Finally, the Ellerth / Faragher Court sought a framework that would be workable and would appropriately take into account the legitimate interests of employers and employees. The Court looked to principles of agency law for guidance, but the Court concluded that the " malleable terminology" of the aided-in-the-commission principle counseled against the wholesale incorporation of that principle into Title VII case law. Ellerth, 524 U.S., at 763, 118 S.Ct. 2257. Instead, the Court also considered the objectives of Title VII, including "the limitation of employer liability in certain circumstances." Id ., at 764, 118 S.Ct. 2257.
The interpretation of the concept of a supervisor that we adopt today is one that can be readily applied. In a great many cases, it will be known even before litigation is commenced whether an alleged harasser was a supervisor, and in others, the alleged harasser's status will become clear to both sides after discovery. And once this is known, the parties will be in a position to assess the strength of a case and to explore the possibility of resolving the dispute. Where this does not occur, supervisor status will generally be capable of resolution at summary judgment. By contrast, under the approach advocated by petitioner and the EEOC, supervisor status would very often be murky-as this case well illustrates.[12]
According to petitioner, the record shows that Davis, her alleged harasser, wielded enough authority to qualify as a supervisor. Petitioner points in particular to Davis' job description, which gave her leadership responsibilities, and to evidence that Davis at times led or directed Vance and other employees in the kitchen. See Brief for Petitioner 42-43 (citing record); Reply Brief 22-23 (same). The United States, on the other hand, while applying the same open-ended *442 test for supervisory status, reaches the opposite conclusion. At least on the present record, the United States tells us, Davis fails to qualify as a supervisor. Her job description, in the Government's view, is not dispositive, and the Government adds that it would not be enough for petitioner to show that Davis "occasionally took the lead in the kitchen." Brief for United States as Amicus Curiae 31 (U.S. Brief).
This disagreement is hardly surprising since the EEOC's definition of a supervisor, which both petitioner and the United States defend, is a study in ambiguity. In its Enforcement Guidance, the EEOC takes the position that an employee, in order to be classified as a supervisor, must wield authority " 'of sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment.' " Id., at 27 (quoting App. to Pet. for Cert. 89a (EEOC Guidance)). But any authority over the work of another employee provides at least some assistance, see Ellerth, supra, at 763, 118 S.Ct. 2257, and that is not what the United States interprets the Guidance to mean. Rather, it informs us, the authority must exceed both an ill-defined temporal requirement (it must be more than "occasiona[l]") and an ill-defined substantive requirement ("an employee who directs 'only a limited number of tasks or assignments' for another employee ... would not have sufficient authority to qualify as a supervisor." U.S. Brief 28 (quoting App. to Pet. for Cert. 92a (EEOC Guidance)); U.S. Brief 31.
*2450 We read the EEOC Guidance as saying that the number (and perhaps the importance) of the tasks in question is a factor to be considered in determining whether an employee qualifies as a supervisor. And if this is a correct interpretation of the EEOC's position, what we are left with is a proposed standard of remarkable ambiguity.
The vagueness of this standard was highlighted at oral argument when the attorney representing the United States was asked to apply that standard to the situation in Faragher, where the alleged harasser supposedly threatened *443 to assign the plaintiff to clean the toilets in the lifeguard station for a year if she did not date him. 524 U.S., at 780, 118 S.Ct. 2275. Since cleaning the toilets is just one task, albeit an unpleasant one, the authority to assign that job would not seem to meet the more-than-a-limited-number-of-tasks requirement in the EEOC Guidance. Nevertheless, the Government attorney's first response was that the authority to make this assignment would be enough. Tr. of Oral Arg. 23. He later qualified that answer by saying that it would be necessary to "know how much of the day's work [was] encompassed by cleaning the toilets." Id., at 23-24. He did not explain what percentage of the day's work (50%, 25%, 10%?) would suffice.
The Government attorney's inability to provide a definitive answer to this question was the inevitable consequence of the vague standard that the Government asks us to adopt. Key components of that standard-"sufficient" authority, authority to assign more than a "limited number of tasks," and authority that is exercised more than "occasionally"-have no clear meaning. Applying these standards would present daunting problems for the lower federal courts and for juries.
Under the definition of "supervisor" that we adopt today, the question of supervisor status, when contested, can very often be resolved as a matter of law before trial. The elimination of this issue from the trial will focus the efforts of the parties, who will be able to present their cases in a way that conforms to the framework that the jury will apply. The plaintiff will know whether he or she must prove that the employer was negligent or whether the employer will have the burden of proving the elements of the Ellerth / Faragher affirmative defense. Perhaps even more important, the work of the jury, which is inevitably complicated in employment discrimination cases, will be simplified. The jurors can be given preliminary instructions that allow them to understand, as the evidence comes in, how each item of proof fits into the framework that they will ultimately be required *444 to apply. And even where the issue of supervisor status cannot be eliminated from the trial (because there are genuine factual disputes about an alleged harasser's authority to take tangible employment actions), this preliminary question is relatively straightforward.
The alternative approach advocated by petitioner and the United States would make matters far more complicated and difficult. The complexity of the standard they favor would impede the resolution of the issue before trial. With the issue still open when trial commences, the parties would be compelled to present evidence and argument on supervisor status, the affirmative defense, and the question of negligence, and the jury would have to grapple with all those issues as well. In addition, it would often be necessary for the jury to be instructed about two very different paths of analysis, i.e., what to do if the alleged harasser was found to be a supervisor and what to do if the alleged harasser was found to be merely a co-worker.
*2451 Courts and commentators alike have opined on the need for reasonably clear jury instructions in employment discrimination cases.[13] And the danger of juror confusion is *445 particularly high where the jury is faced with instructions on alternative theories of liability under which different parties bear the burden of proof.[14] By simplifying the process of determining who is a supervisor (and by extension, which liability rules apply to a given set of facts), the approach that we take will help to ensure that juries return verdicts that reflect the application of the correct legal rules to the facts.
Contrary to the dissent's suggestions, see post, at 2461 - 2462, 2463 - 2464, this approach will not leave employees unprotected against harassment by co-workers who possess the authority to inflict psychological injury by assigning unpleasant tasks or by altering the work environment in objectionable ways. In such cases, the victims will be able to prevail simply by showing that the employer was negligent in permitting this harassment to occur, and the jury should be instructed that the nature and degree of authority wielded by the harasser is an important factor to be considered in determining *446 whether the employer was negligent. The nature and degree of authority possessed by harassing employees varies greatly, see post, 2459 - 2460 (offering examples), and as we explained above, the test proposed by petitioner and the United States is ill equipped to deal with the variety of situations that will inevitably arise. This variety *2452 presents no problem for the negligence standard, which is thought to provide adequate protection for tort plaintiffs in many other situations. There is no reason why this standard, if accompanied by proper instructions, cannot provide the same service in the context at issue here.
D
The dissent argues that the definition of a supervisor that we now adopt is out of touch with the realities of the workplace, where individuals with the power to assign daily tasks are often regarded by other employees as supervisors. See post, at 2456 - 2457, 2458 - 2461. But in reality it is the alternative that is out of touch. Particularly in modern organizations that have abandoned a highly hierarchical management structure, it is common for employees to have overlapping authority with respect to the assignment of work tasks. Members of a team may each have the responsibility for taking the lead with respect to a particular aspect of the work and thus may have the responsibility to direct each other in that area of responsibility.
Finally, petitioner argues that tying supervisor status to the authority to take tangible employment actions will encourage employers to attempt to insulate themselves from liability for workplace harassment by empowering only a handful of individuals to take tangible employment actions. But a broad definition of "supervisor" is not necessary to guard against this concern.
As an initial matter, an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment. And even if an employer concentrates all decisionmaking authority in a few individuals, *447 it likely will not isolate itself from heightened liability under Faragher and Ellerth . If an employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee. Cf. Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 509 (C.A.7 2004) (Rovner, J., concurring in part and concurring in judgment) ("Although they did not have the power to take formal employment actions vis-à-vis [the victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work-certainly more familiar with it than the off-site Department Administrative Services Manager"). Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies. See Ellerth, 524 U.S., at 762, 118 S.Ct. 2257.
IV
Importuning Congress, post, at 2465 - 2466, the dissent suggests that the standard we adopt today would cause the plaintiffs to lose in a handful of cases involving shocking allegations of harassment, see post, at 2459 - 2461. However, the dissent does not mention why the plaintiffs would lose in those cases. It is not clear in any of those examples that the legal outcome hinges on the definition of "supervisor." For example, Clara Whitten ultimately did not prevail on her discrimination claims-notwithstanding the fact that the Fourth Circuit adopted the approach advocated by the dissent, see Whitten v. Fred's, Inc., 601 F.3d 231, 243-247 (2010) -because the District Court subsequently dismissed her claims for lack of jurisdiction. See *2453 Whitten v. Fred's, Inc., No. 8:08-0218-HMH-BHH, 2010 WL 2757005, at *3 (D.S.C., July 12, 2010). And although the dissent suggests that Donna Rhodes' employer would have been liable under the dissent's definition *448 of "supervisor," that is pure speculation: It is not clear that Rhodes suffered any tangible employment action, see Rhodes v. Illinois Dept. of Transp., 243 F.Supp.2d 810, 817 (N.D.Ill.2003), and no court had occasion to determine whether the employer could have established the affirmative defense (a prospect that is certainly feasible given that there was evidence that the employer had an " adequate anti-harassment policy in place," that the employer promptly addressed the incidents about which Rhodes complained, and that "Rhodes failed to take advantage of the preventative or corrective opportunities provided," Rhodes v. Illinois Dept. of Transp., 359 F.3d, at 507).[15] Finally, the dissent's reliance on Monika Starke's case is perplexing given that the EEOC ultimately did obtain relief (in the amount of $50,000) for the harassment of Starke,[16] see Order of Dismissal in No. 1:07-cv-0095-LRR (ND Iowa, Feb. 2, 2013), Dkt. No. 380, Exh. 1, ¶ 1, notwithstanding the fact that the court in that case applied the definition of "supervisor" that we adopt today, see EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 684 (C.A.8 2012).
In any event, the dissent is wrong in claiming that our holding would preclude employer liability in other cases with facts similar to these. Assuming that a harasser is not a supervisor, a plaintiff could still prevail by showing that his *449 or her employer was negligent in failing to prevent harassment from taking place. Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant. Thus, it is not true, as the dissent asserts, that our holding "relieves scores of employers of responsibility" for the behavior of workers they employ. Post, at 2462.
The standard we adopt is not untested. It has been the law for quite some time in the First, Seventh, and Eighth Circuits, see, e.g., Noviello v. Boston, 398 F.3d 76, 96 (C.A.1 2005) ; Weyers v. Lear Operations Corp., 359 F.3d 1049, 1057 (C.A.8 2004) ; Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1033-1034, and n. 1 (C.A.7 1998) -i.e., in Arkansas, Illinois, Indiana, Iowa, Maine, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, North Dakota, Rhode Island, South Dakota, and Wisconsin. We are aware of no evidence that this rule has produced dire consequences in these 14 jurisdictions.
Despite its rhetoric, the dissent acknowledges that Davis, the alleged harasser *2454 in this case, would probably not qualify as a supervisor even under the dissent's preferred approach. See post, at 2465 ("[T]here is cause to anticipate that Davis would not qualify as Vance's supervisor"). On that point, we agree. Petitioner did refer to Davis as a "supervisor" in some of the complaints that she filed, App. 28; id., at 45, and Davis' job description does state that she supervises Kitchen Assistants and Substitutes and "[l]ead[s] and direct[s]" certain other employees, id., at 12 - 13. But under the dissent's preferred approach, supervisor status hinges not on formal job titles or "paper descriptions" but on "specific facts about the working relationship." Post, at 2465 (internal quotation marks omitted).
Turning to the "specific facts" of petitioner's and Davis' working relationship, there is simply no evidence that Davis directed petitioner's day-to-day activities. The record indicates that Bill Kimes (the general manager of the Catering *450 Division) and the chef assigned petitioner's daily tasks, which were given to her on "prep lists." No. 1:06-cv-1452-SEB-JMS, 2008 WL 4247836, at *7 (S.D.Ind., Sept. 10, 2008) ; App. 430, 431. The fact that Davis sometimes may have handed prep lists to petitioner, see id., at 74, is insufficient to confer supervisor status, see App. to Pet. for Cert. 92a (EEOC Guidance). And Kimes-not Davis-set petitioner's work schedule. See App. 431. See also id., at 212.
Because the dissent concedes that our approach in this case deprives petitioner of none of the protections that Title VII offers, the dissent's critique is based on nothing more than a hypothesis as to how our approach might affect the outcomes of other cases-cases where an employee who cannot take tangible employment actions, but who does direct the victim's daily work activities in a meaningful way, creates an unlawful hostile environment, and yet does not wield authority of such a degree and nature that the employer can be deemed negligent with respect to the harassment. We are skeptical that there are a great number of such cases. However, we are confident that, in every case, the approach we take today will be more easily administrable than the approach advocated by the dissent.
* * *
We hold that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim. Because there is no evidence that BSU empowered Davis to take any tangible employment actions against Vance, the judgment of the Seventh Circuit is affirmed.
It is so ordered.

See, e.g., Williams v. Waste Management of Ill., 361 F.3d 1021, 1029 (C.A.7 2004) ; McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1119 (C.A.9 2004) ; Joens v. John Morrell & Co., 354 F.3d 938, 940 (C.A.8 2004) ; Noviello v. Boston, 398 F.3d 76, 95 (C.A.1 2005) ; Duch v. Jakubek, 588 F.3d 757, 762 (C.A.2 2009) ; Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104-105 (C.A.3 2009).

The Restatement (Third) of Agency disposed of this exception to liability, explaining that "[t]he purposes likely intended to be met by the 'aided in accomplishing' basis are satisfied by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents." 2 Restatement (Third) § 7.08, p. 228 (2005). The parties do not argue that this change undermines our holdings in Faragher and Ellerth .

Faragher and Ellerth involved hostile environment claims premised on sexual harassment. Several federal courts of appeals have held that Faragher and Ellerth apply to other types of hostile environment claims, including race-based claims. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 186, n. 9 (C.A.4 2001) (citing cases reflecting "the developing consensus ... that the holdings [in Faragher and Ellerth ] apply with equal force to other types of harassment claims under Title VII"). But see Ellerth, 524 U.S., at 767, 118 S.Ct. 2257 (THOMAS, J., dissenting) (stating that, as a result of the Court's decision in Ellerth, "employer liability under Title VII is judged by different standards depending upon whether a sexually or racially hostile work environment is alleged"). Neither party in this case challenges the application of Faragher and Ellerth to race-based hostile environment claims, and we assume that the framework announced in Faragher and Ellerth applies to cases such as this one.

The United States urges us to defer to the EEOC Guidance. Brief for United States as Amicus Curiae 26-29 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ). But to do so would be proper only if the EEOC Guidance has the power to persuade, which "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." Id., at 140, 65 S.Ct. 161. For the reasons explained below, we do not find the EEOC Guidance persuasive.

http://www.businessdictionary.com/definition/supervisor.html (all Internet materials as visited June 21, 2013, and available in Clerk of Court's case file).

http://management.about.com/od/policiesand procedures/g/supervisor1.html

One outlier that petitioner points to is the National Labor Relations Act (NLRA), 29 U.S.C. § 152(11). Petitioner argues that the NLRA's definition supports her position in this case to the extent that it encompasses employees who have the ability to direct or assign work to subordinates. Brief for Petitioner 27-28.
The NLRA certainly appears to define "supervisor" in broad terms. The National Labor Relations Board (NLRB) and the lower courts, however, have consistently explained that supervisory authority is not trivial or insignificant: If the term "supervisor" is construed too broadly, then employees who are deemed to be supervisors will be denied rights that the NLRA was intended to protect. E.g., In re Connecticut Humane Society, 358 NLRB No. 31, 2012 WL 1249565, at *33 (Apr. 12, 2012) ; Frenchtown Acquisition Co., Inc. v. NLRB, 683 F.3d 298, 305 (C.A.6 2012) ; Beverly Enterprises-Massachusetts, Inc. v. NLRB, 165 F.3d 960, 963 (C.A.D.C.1999). Indeed, in defining a supervisor for purposes of the NLRA, Congress sought to distinguish "between straw bosses, leadmen, set-up men, and other minor supervisory employees, on the one hand, and the supervisor vested with such genuine management prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action." S.Rep. No. 105, 80th Cong., 1st Sess., 4 (1947). Cf. NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571, 586, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994) (HCRA ) (GINSBURG, J., dissenting) ("Through case-by-case adjudication, the Board has sought to distinguish individuals exercising the level of control that truly places them in the ranks of management, from highly skilled employees, whether professional or technical, who perform, incidentally to their skilled work, a limited supervisory role"). Accordingly, the NLRB has interpreted the NLRA's statutory definition of supervisor more narrowly than its plain language might permit. See, e.g., Connecticut Humane Society, supra, at *39 (an employee who evaluates others is not a supervisor unless the evaluation "affect[s] the wages and the job status of the employee evaluated"); In re CGLM, Inc., 350 NLRB 974, 977 (2007) (" 'If any authority over someone else, no matter how insignificant or infrequent, made an employee a supervisor, our industrial composite would be predominantly supervisory. Every order-giver is not a supervisor. Even the traffic director tells the president of the company where to park his car' " (quoting NLRB v. Security Guard Serv., Inc., 384 F.2d 143, 151 (C.A.5 1967) )). The NLRA therefore does not define the term "supervisor" as broadly as petitioner suggests.
To be sure, the NLRA may in some instances define "supervisor" more broadly than we define the term in this case. But those differences reflect the NLRA's unique purpose, which is to preserve the balance of power between labor and management, see HCRA,supra, at 573, 114 S.Ct. 1778 (explaining that Congress amended the NLRA to exclude supervisors in order to address the "imbalance between labor and management" that resulted when "supervisory employees could organize as part of bargaining units and negotiate with the employer"). That purpose is inapposite in the context of Title VII, which focuses on eradicating discrimination. An employee may have a sufficient degree of authority over subordinates such that Congress has decided that the employee should not participate with lower level employees in the same collective-bargaining unit (because, for example, a higher level employee will pursue his own interests at the expense of lower level employees' interests), but that authority is not necessarily sufficient to merit heightened liability for the purposes of Title VII. The NLRA's definition of supervisor therefore is not controlling in this context.

The dissent suggests that it is unclear whether Terry would qualify as a supervisor under the test we adopt because his hiring decisions were subject to approval by higher management. Post, at 2458, n. 1 (opinion of GINSBURG, J.). See also Faragher, 524 U.S., at 781, 118 S.Ct. 2275. But we have assumed that tangible employment actions can be subject to such approval. See Ellerth, 524 U.S., at 762, 118 S.Ct. 2257. In any event, the record indicates that Terry possessed the power to make employment decisions having direct economic consequences for his victims. See Brief for Petitioner in Faragher v. Boca Raton, O.T. 1997, No. 97-282, p. 9 ("No one, during the twenty years that Terry was Marine Safety Chief, was hired without his recommendation. [He] initiated firing and suspending personnel. [His] evaluations of the lifeguards translated into salary increases. [He] made recommendations regarding promotions ..." (citing record)).

Moreover, it is by no means certain that Silverman lacked the authority to take tangible employment actions against Faragher. In her merits brief, Faragher stated that, as a lieutenant, Silverman "made supervisory and disciplinary decisions and had input on the evaluations as well." Id., at 9-10. If that discipline had economic consequences (such as suspension without pay), then Silverman might qualify as a supervisor under the definition we adopt today.
Silverman's ability to assign Faragher significantly different work responsibilities also may have constituted a tangible employment action. Silverman told Faragher, " 'Date me or clean the toilets for a year.' " Faragher, supra, at 780, 118 S.Ct. 2275. That threatened reassignment of duties likely would have constituted significantly different responsibilities for a lifeguard, whose job typically is to guard the beach. If that reassignment had economic consequences, such as foreclosing Faragher's eligibility for promotion, then it might constitute a tangible employment action.

The lower court did not even address this issue. See Faragher v. Boca Raton, 111 F.3d 1530, 1547 (C.A.11 1997) (Anderson, J., concurring in part and dissenting in part) (noting that it was unnecessary to "decide the threshold level of authority which a supervisor must possess in order to impose liability on the employer").

According to the dissent, the rule that we adopt is also inconsistent with our decision in Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). See post, at 2458 - 2459. The question in that case was "whether a constructive discharge brought about by supervisor harassment ranks as a tangible employment action and therefore precludes assertion of the affirmative defense articulated in Ellerth and Faragher ." Suders,supra, at 140, 124 S.Ct. 2342. As the dissent implicitly acknowledges, the supervisor status of the harassing employees was not before us in that case. See post, at 2458 - 2459. Indeed, the employer conceded early in the litigation that the relevant employees were supervisors, App. in Pennsylvania State Police v. Suders, O.T. 2003, No. 03-95, p. 20 (Answer ¶ 29), and we therefore had no occasion to question that unchallenged characterization.

The dissent attempts to find ambiguities in our holding, see post, at 15-16, and n. 5, but it is indisputable that our holding is orders of magnitude clearer than the nebulous standard it would adopt. Employment discrimination cases present an almost unlimited number of factual variations, and marginal cases are inevitable under any standard.

See, e.g., Gross v. FBL Financial Services, Inc., 557 U.S. 167, 179, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) ; Armstrong v. Burdette Tomlin Memorial Hospital, 438 F.3d 240, 249 (C.A.3 2006) (noting in the context of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that that "the 'prima facie case and the shifting burdens confuse lawyers and judges, much less juries, who do not have the benefit of extensive study of the law on the subject' " (quoting Mogull v. Commercial Real Estate, 162 N.J. 449, 471, 744 A.2d 1186, 1199 (2000) )); Whittington v. Nordam Group Inc., 429 F.3d 986, 998 (C.A.10 2005) (noting that unnecessarily complicated instructions complicate a jury's job in employment discrimination cases, and "unnecessary complexity increases the opportunity for error"); Sanders v. New York City Human Resources Admin., 361 F.3d 749, 758 (C.A.2 2004) ("Making the burden-shifting scheme of McDonnell Douglas part of a jury charge undoubtedly constitutes error because of the manifest risk of confusion it creates"); Mogull, supra, at 473, 744 A.2d, at 1200 ("Given the confusion that often results when the first and second stages of the McDonnell Douglas test goes to the jury, we recommend that the court should decide both those issues"); Tymkovich, The Problem with Pretext, 85 Denver Univ. L.Rev. 503, 527-529 (2008) (discussing the potential for jury confusion that arises when instructions are unduly complex and proposing a simpler framework); Grebeldinger, Instructing the Jury in a Case of Circumstantial Individual Disparate Treatment: Thoroughness or Simplicity? 12 Lab. Law. 399, 419 (1997) (concluding that more straightforward instructions "provid[e] the jury with clearer guidance of their mission"); Davis, The Stumbling Three-Step, Burden-Shifting Approach in Employment Discrimination Cases, 61 Brook. L.Rev. 703, 742-743 (1995) (discussing potential for juror confusion in the face of complex instructions); Note, Toward a Motivating Factor Test for Individual Disparate Treatment Claims, 100 Mich. L.Rev. 234, 262-273 (2001) (discussing the need for a simpler approach to jury instructions in employment discrimination cases).

Cf. Struve, Shifting Burdens: Discrimination Law Through the Lens of Jury Instructions, 51 Boston College L.Rev. 279, 330-334 (2010) (arguing that unnecessary confusion arises when a jury must resolve different claims under different burden frameworks); Monahan, Cabrera v. Jakabovitz -A Common-Sense Proposal for Formulating Jury Instructions Regarding Shifting Burdens of Proof in Disparate Treatment Discrimination Cases, 5 Geo. Mason U.C.R.L.J. 55, 76 (1994) ("Any jury instruction that attempts to shift the burden of persuasion on closely related issues is never likely to be successful").

Similarly, it is unclear whether Yasharay Mack ultimately would have prevailed even under the dissent's definition of "supervisor." The Second Circuit (adopting a definition similar to that advocated by the dissent) remanded the case for the District Court to determine whether Mack " 'unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.' " Mack v. Otis Elevator Co., 326 F.3d 116, 127-128 (2003) (quoting Ellerth, 524 U.S., at 765, 118 S.Ct. 2257). But before it had an opportunity to make any such determination, Mack withdrew her complaint and the District Court dismissed her claims with prejudice. See Stipulation and Order of Dismissal in No. 1:00-cv-7778-LAP (SDNY, Oct. 21, 2004), Dkt. No. 63.

Starke herself lacked standing to pursue her claims, see EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 678, and n. 14 (C.A.8 2012), but the Eighth Circuit held that the EEOC could sue in its own name to remedy the sexual harassment against Starke and other CRST employees, see id., at 682.