**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted January 11, 2017[*]
Decided February 9, 2017

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

| | |
|---|---|
| No. 16-2283 | |
| GLENDA CABLE,<br>    *Plaintiff-Appellant,* | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| *v.* | |
| | No. 1:14-cv-01853-TWP-DKL |
| FCA US LLC,<br>    *Defendant-Appellee.* | **Tanya Walton Pratt**,<br>*Judge.* |

## O R D E R

Glenda Cable sued her employer, FCA US LLC, the American subsidiary of Fiat Chrysler Automobiles, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981, alleging that FCA subjected her to a hostile work environment because of her race. The district court granted FCA summary judgment for two reasons.

---

[*] We have unanimously agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

It decided that the racial harassment of Cable was not sufficiently pervasive or severe to be prohibited by these statutes and that FCA was not liable for this harassment. We question the first reason but affirm the judgment because Cable lacks a legal basis to hold FCA liable for the harassment that she experienced.

Cable, an employee of FCA for more than 27 years, works at FCA's plant in Kokomo, Indiana, as a production operator, building transmissions on an assembly line. She is the only African American on her seven-member team that performs this job. Three other teams also manufacture transmissions in the same area of the plant as Cable's team and have African American members.

Over a 14-month period, Cable says that she was harassed because of her race on five different occasions, beginning with a co-worker's display of a voodoo doll. She testified that she saw a black voodoo doll hanging from the belt of her team leader, Scott Eltzroth, who had tied a string around the doll's neck.[1] Cable told Eltzroth, who is white, that the doll offended her and asked him to remove it. He refused. Eltzroth poked the doll with needles and told Cable that the doll was "for his f***** personal protection" and was part of African history. This comment further upset Cable. She reported this situation to her supervisor and requested that FCA's Labor Relations Supervisor, Lawrence Wilson, come to her workstation. Wilson, who is African American, discussed this situation with her. Even though he did not believe that the doll had racial import, Wilson addressed the matter with Eltzroth and told him to never wear the doll or have it at work. Cable did not see the doll again.

Roughly five weeks later, Cable found the letters "NIG" etched into a "control box" at one of her workstations. Cable reported the etching to a supervisor, who told her that the lettering would be removed before her next shift and asked maintenance staff to remove it. Another supervisor reported the incident to Wilson. But the next day, the control box still showed the "NIG" etching, making Cable feel "shame [and] disgust." The supervisor again requested its removal, and later that morning the letters were sanded over. But Cable still could see a "shadow" of the letters if she viewed them from a certain angle, though not under the plant's lighting alone. She did not complain about this shadow to her supervisors and did not know who made the etching. Neither did Wilson after talking with the two supervisors.

---

[1] Eltzroth was not a manager and lacked the authority to make personnel decisions about hiring, firing, and discipline.

Six months later, Cable noticed that the letter "N" had been etched into the control box in the same place as the "NIG" etching. Cable was so upset by this etching that, after talking with Wilson and the other supervisors, she left work early. She began a three-month medical leave of absence and was diagnosed with depression and anxiety, precipitated by workplace stress. During her leave Cable underwent frequent counseling and told her doctor that after seeing the etchings, she feared that her life was threatened at work. Wilson directed maintenance workers to paint over the entire control panel. He also interviewed the 12 employees who had access to the workstation but never determined who made the "N" etching. During the two days after Cable left the plant, supervisors met with team members to discuss workplace discrimination and harassment and reviewed FCA's policies prohibiting this conduct.

On her first day back from medical leave, Cable was taken aback by a drawing of a face that she saw on a guardrail. Above the drawing were the words "Red Eye"—which she understood as a derogatory reference to African Americans. She believed that the drawing depicted her because the face bore a mark in the same place where she often wears a band-aid. Wilson did not know of any "red eye" stereotypes and did not think that the drawing depicted Cable. Nevertheless, he directed maintenance staff to repaint the guardrail. Neither Wilson nor Cable knew who made this drawing.

Four months later Cable saw an etching on a different machine that she believed said "NIG" or "bitch." After she complained about this etching to a supervisor, Wilson had it sanded and painted over. He thought that the etching was made by a torque gun and did not have any intended meaning. Cable did not know who made the etching.

Several months later Cable brought this suit. The district court ultimately granted summary judgment for FCA, concluding that Cable did not present sufficient evidence from which a jury reasonably could conclude that she experienced a hostile work environment. The court determined that only Eltzroth's display of the black doll and the first two etchings were racially offensive. But this harassment was not severe or pervasive, the court determined, because it was not frequent, physically threatening, or directed at Cable, and further, the impact of viewing the letters "NIG" and "N" was less severe than seeing or hearing the word "n****." And even if the conduct was severe or pervasive harassment, the court added, Cable lacked a basis to hold FCA liable because it was not negligent in discovering or remedying the harassment: FCA promptly removed the etchings and investigated who made them, held anti-harassment training after learning of the second etching, and in regard to the voodoo doll incident, directed Eltzroth to remove the doll.

Title VII and Section 1981 claims are governed by the same framework of analysis. See *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004). For Cable's claims to survive summary judgment, she had to show (i) that her work environment was objectively and subjectively offensive; (ii) that the harassment was based on her race; (iii) that the harassment was pervasive or severe; and (iv) that a legal basis exists for holding FCA liable. See *Faragher v. City of Boca Raton*, 524 U.S. 775, 787—89 (1998); *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).

On appeal Cable asserts that the district court improperly disregarded her evidence of severe and pervasive harassment. The district court, however, concluded that even if she could show that the harassment was severe or pervasive, she could not establish a basis for employer liability. As the district court explained, Cable did not present evidence that a supervisor engaged in this harassment, so she must show that FCA was "negligent either in discovering or remedying the harassment." *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016) (internal quotation marks and citation omitted).

Cable makes two arguments on the issue of employer liability. First, she asserts that the district court erred in deciding that she had not established a fact question whether FCA was negligent in remedying the voodoo doll incident. If FCA had disciplined Eltzroth more severely for wearing the voodoo doll, she says, then the other incidents of racial harassment would not have occurred. But as the district court correctly decided, FCA did not act negligently in responding to Eltzroth's display of the voodoo doll because FCA demanded that he never bring it to work again and thereby promptly stopped this conduct from recurring. "It would push the role of deterrence too far" to blame FCA for "a response which . . . [was] within the realm of reasonableness" at the time that Cable reported the voodoo doll. *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 382 (7th Cir. 2002); see generally *Vance v. Ball State Univ.*, 570 U.S. —,—, 133 S. Ct. 2434, 2439 (2013) (negligence standard for employer liability for harassment by co-workers).

Second, Cable argues that the district court erred in deciding that FCA acted reasonably in responding to the "NIG" etching. In her view, FCA was negligent by merely sanding—rather than painting over—the "NIG" etching, which she said left behind a shadow of its outline. But we agree with the district court that FCA was not negligent in removing this etching. The shadow of "NIG" could not be seen under normal lighting, and Cable did not give FCA an opportunity to eliminate the shadow because she did not tell her employer of its existence. In addition Cable asserts that FCA acted unreasonably by failing to interview her coworkers about who made this etching immediately after she complained about it. We cannot conclude that FCA was negligent

because Wilson asked the area supervisors and Cable about who did this etching and later interviewed Cable's coworkers after learning of the "N" etching.

We make two final points. First, we question the district court's observation that the impact of viewing the letters "NIG" and "N" is less severe than hearing or seeing the word "n*****" spelled out. In light of all the circumstances, a jury might well find that a reasonable person in Cable's position would find the "NIG" and "N" etchings at the workstation of Cable and other African American employees were intended to express racial hostility and to make the workplace racially hostile or abusive. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (applying objective standard to hostile environment claims). Second, the district court minimized the severity of the harassment by attributing too much significance to whether it targeted Cable. Title VII prohibits harassment that targets the work area of an employee in a protected group and vilifies it, even when the employee is "not singled out." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007). The etchings' communication of the word "n*****" and the doll's representation of a lynching could enable a factfinder to infer that this conduct vilified African Americans at Cable's workstation.

But because Cable lacks a basis to hold FCA liable for the racial harassment that she experienced, we AFFIRM the district court's judgment.