**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-2092**

KIMBERLY J. MCKINNISH,

Plaintiff - Appellant,

v.

MEGAN J. BRENNAN, Postmaster General, U.S. Postal Service,[1]

Defendant - Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Max O. Cogburn, Jr., District Judge. (1:13-cv-00087-MOC-DLH)

Argued: October 7, 2015                    Decided: November 6, 2015

Before TRAXLER, Chief Judge, and KING and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Christopher Douglas Vaughn, THE VAUGHN LAW FIRM, LLC, Decatur, Georgia, for Appellant. Paul Bradford Taylor, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Anne M. Tompkins, United States Attorney,

---

[1] Megan J. Brennan is substituted as Defendant-Appellee for her predecessor, Patrick Donahoe, as Postmaster General of the United States. See Fed. R. App. P. 43(c)(2).

OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kimberly McKinnish ("Appellant") appeals from the district court's entry of summary judgment in favor of the United States Postmaster General ("Appellee"). Appellant filed a Title VII lawsuit against Appellee based on alleged sexual harassment by David Duncan, an individual she refers to as her supervisor. The district court, however, ruled that Duncan was not her supervisor as a matter of law, based on the Supreme Court's recent decision in Vance v. Ball State University, 133 S. Ct. 2434 (2013). Therefore, Appellant was required to show that Appellee was negligent, which the district court concluded she did not do.

Even assuming Duncan was Appellant's supervisor, Appellant has not produced sufficient evidence that Duncan's actions culminated in a tangible employment action, and Appellee is entitled to the benefit of the affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). We affirm the district court on this ground.

I.

A.

Appellant worked for the United States Postal Service in its Asheville, North Carolina office. She was a Transitional Employee ("TE"), and her duties included delivering mail on

3

various routes when a permanent employee "was on vacation or sick leave, or where a route did not have an assigned permanent carrier." J.A. 34.[2] All TEs were expected to deliver mail on any available routes, including walking and riding routes.

While in the Asheville office, Appellant worked with David Duncan. Appellant refers to Duncan as her "supervisor," but his legal status as to her is a matter of dispute. He was classified by the Postal Service as an EAS-17 Supervisor of Customer Service and was responsible for "supervising subordinate employees in the performance of their assigned duties." J.A. 170. Specifically, his job description included "evaluat[ing] the daily workload"; "mak[ing] carrier and route assignments"; "mak[ing] temporary changes in routes and time schedules"; "authoriz[ing] overtime work"; "[e]stablish[ing] work schedules"; and "allocat[ing] work hours to meet service requirements." Id. at 114.

Beginning in January 2010 and continuing for approximately ten months, Duncan and Appellant exchanged numerous text messages and videos. The exchanges were often sexually explicit in nature. During this time frame, Duncan

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

also made requests that seemed based on his authority over Appellant, as well as suggestions that he would reward Appellant for her responses. See, e.g., J.A. 185 ("Even if I did have them lined up, you would be in the front of the line!!!!!"); id. at 190-91 ("Do you know rt 115?"[3] "I might can get you on it tomorrow."); id. at 192 ("Think you might can take a picture for your 'Master' tonight?").

Appellant claims that, generally, she responded to Duncan's requests by sending photos she found on the Internet or text messages copying words from pornographic magazines. The record also includes some of her messages from early November 2010, including the following texts: "WOW!! You definitely know how to put a smile on my face"; "Good morning :)"; "LOL! You are too funny :)"; and "OMG . . . I just saw it, sorry! I just adore you :)." J.A. 59-60, 95.

Appellant did not report this conduct to her employer; rather, her husband found the messages on November 16, 2010, and reported them to the Postal Service. Appellant claims that she only participated in the exchanges "due to a change in my work status when I did not participate and for fear that I would be retaliated against if I did not." J.A. 180. Appellant

---

[3] Route 115 was a desirable route because of the ease of access to the boxes and relatively flat terrain.

explained that she received "favorable treatment" when she complied with Duncan's requests, id., and when she did not honor Duncan's requests, Duncan brought her in to work after the other workers and gave her "bad" routes, id. at 182, 73. Nonetheless, Appellant testified that overall, in 2010 her "hours of work remained fairly constant" and she "made more money [that year] than [she] ever made." Id. at 74.

At no point did Appellant tell anyone at the Postal Service about the messages or otherwise avail herself of the protections and procedures laid out in the Postal Service's sexual harassment policy. She claimed she was afraid "management[] would look at me like I was a troublemaker and I would lose my job." J.A. 79.

## B.

Appellant filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that she was sexually harassed by Duncan. The EEOC issued a decision finding no actionable claim, and the Postal Service reviewed and adopted that decision, concluding, "[Y]ou have not shown that you were the victim of illegal discrimination." J.A. 12.

On March 28, 2013, Appellant filed an action in the Western District of North Carolina against Appellee, alleging one count of sexual harassment. On April 28, 2014, Appellee filed a motion for summary judgment, which the district court

6

granted on August 15, 2014.  See McKinnish v. Donahoe, 40 F. Supp. 3d 689 (W.D.N.C. 2014).  The district court concluded that Duncan was a coworker, not a supervisor, under the Supreme Court's recent decision in Vance v. Ball State University, 133 S. Ct. 2434 (2013).  It then decided Appellant presented no evidence that the Postal Service's investigation was inadequate; therefore, Appellee was not negligent in controlling Appellant's working conditions.  See McKinnish, 40 F. Supp. 3d at 697.

## II.

We may affirm the district court's decision "on any grounds apparent from the record."  United States v. Price, 777 F.3d 700, 707 (4th Cir. 2015) (internal quotation marks omitted).  We review the district court's grant of summary judgment de novo, "drawing reasonable inferences in the light most favorable to the non-moving party."  Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 407 (4th Cir. 2015) (internal quotation marks omitted).  This court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We have held, "A mere scintilla of proof . . . will not suffice to prevent summary judgment; the question is 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party' resisting

7

summary judgment." Peters v. Jenney, 327 F.3d 307, 314 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)).

### III.

The parties dispute whether Duncan was Appellant's supervisor as a matter of law pursuant to Vance v. Ball State University, 133 S. Ct. 2434 (2013). Even assuming he was, however, we conclude that Appellant has not marshaled sufficient evidence to demonstrate that Duncan's conduct culminated in a tangible employment action, and Appellee has successfully raised the affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) (the "Faragher-Ellerth defense").

Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (internal quotation marks and alteration omitted). The district court construed Appellant's complaint to contain two causes of action under Title VII: a hostile work environment claim and a quid pro quo harassment claim. For both causes of action, there must be some basis for imputing liability to the employer. See Freeman v. Dal-Tile

8

Corp., 750 F.3d 413, 420 (4th Cir. 2014); Okoli v. City Of Baltimore, 648 F.3d 216, 222 (4th Cir. 2011).

Vance explains that if the alleged harasser is a supervisor,

> [and] the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

133 S. Ct. at 2439 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 278 (4th Cir. 2015) (en banc). Therefore, we first turn to whether Duncan's alleged harassment culminated in a tangible employment action.

### A.

A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Vance, 133 S. Ct. at 2442 (quoting Ellerth, 524 U.S. at 761). There is no record evidence demonstrating that Duncan had the authority to hire, fire, promote, or reassign Appellant

9

to a position with significantly different responsibilities. Therefore, we look to whether Duncan made a "significant change in [Appellant's] benefits." This court has quoted with favor the Eleventh Circuit's statement that "[a] reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 331 n.7 (4th Cir. 2012) (quoting Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006)).

On this point, Appellant presents an attachment to her EEOC complaint, wherein she stated, "During the course of [] Duncan's repeated solicitations, . . . he . . . reduce[d], alter[ed], and change[d] my working hours . . . ." J.A. 167. She also stated that Duncan "started [b]ringing [her] in at 9:30-10:00 A.M. and the other TE's were [b]eginning work at 7:30 A.M." Id. at 182.

Appellant's fellow carriers also submitted affidavits in support of her claim. An affidavit from fellow carrier Kimberly Taylor stated, "[Duncan] would bring her in late at 10 and the rest of the TE's would be starting at 7:30." J.A. 183. Another, from Cassandra Pee, stated, "I saw that she was coming in later than the other TE. I also notices [sic] she was not working as much as the other TE's." Id. at 184. Taylor also declared,

> [Appellant] would always get the worst routes and when she would question [her] supervisor she would be told that[']s how it is. The reason I know this is we (other carriers) would question why [Appellant] would get dumped on all the time. I have worked for the Post Office for 15+ years and I have never seen someone treated as poorly as she was treated.

Id. at 183.

Appellant also admitted, however, that TEs "kind of fill in where they need a carrier on a transitional basis," and she did not always "have the same route every day," but her routes would "change by the day." J.A. 71. Indeed, Duncan stated that all TEs were sometimes scheduled to work five days, and sometimes six days, and if a TE "was going to work six days in a week, they would be scheduled to come in later in the day on some days that week to keep their basic weekly hours around forty." Id. at 228. Appellant has presented nothing to dispute this testimony. Therefore, the fact that Appellant was coming in later on certain days, or that an employee observed that she was "not working as much," does not necessarily mean that her hours were reduced. In fact, Appellant herself admitted that her "hours [] remained fairly constant." Id. at 74. Moreover, the record includes timesheets from each of the 16 weeks that Appellant worked a six-day workweek in 2010, and these timesheets show that during these pay periods, she was receiving

11

anywhere from 3.5% to 22.9% overtime, and she never dropped below a 40-hour workweek.

Appellant has presented no means to delineate timesheets during periods when she succumbed to Duncan's requests to periods when she did not. Appellant has presented no gauge of how her hours converted to pay during the time she was texting with Duncan, and how that pay may have decreased or increased. To the extent the case law dictates that a tangible employment action can be a positive change in benefits (an issue we do not decide today), we have nothing, besides Appellant's bare assertions, demonstrating that her hours were increased after responding to Duncan's requests. See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (holding "[c]onclusory or speculative allegations do not suffice" to demonstrate a genuine issue of material fact).

Appellant has failed to present more than a "mere scintilla of proof" that Duncan's conduct resulted in a "significant" change in her benefits, and we conclude that there is no evidence "upon which a jury could properly proceed to find a verdict" in her favor on this issue. Peters v. Jenney, 327 F.3d 307, 314 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)). Therefore, Appellant has not created a genuine dispute of fact on the issue of

12

whether Duncan's actions culminated in a tangible employment action.

## B.

We have explained, "[W]hen the harasser is a supervisor, the employer is presumptively liable under the doctrine of respondeat superior, unless the Faragher–Ellerth defense applies." Dulaney, 673 F.3d 323, 330 n.7. Thus, Appellee can escape liability by establishing, by a preponderance of the evidence: (1) it exercised reasonable care to prevent and correct any harassing behavior; and (2) Appellant unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. See Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.

## 1.

We first address whether there is any dispute that the employer exercised reasonable care to prevent and correct Duncan's harassing behavior.

We have held that "dissemination of an effective anti-harassment policy provides compelling proof that an employer has exercised reasonable care to prevent and correct sexual harassment." Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 268 (4th Cir. 2001) (internal quotation marks omitted). Here, Appellee had a clear and comprehensive policy. It explained, first, to "[t]ell the [h]arasser to [s]top!" J.A.

13

139. It also gave supervisors direction to "[c]onduct a thorough inquiry" and "[t]ake prompt action to put an end to the harassment." Id. at 141. And most importantly, it explained that employees who are being harassed should report to a supervisor, manager, Human Resources personnel, or the inspector; or "if [the employee is] uncomfortable," he or she could "ask a union representative or coworker" to help report the conduct. Id. at 140.[4] Further, the Postal Service clearly took swift action to correct the harassment. After Appellant's husband made his report, Duncan was terminated, and there was no further harassment.

2.

Next, we look to whether Appellant unreasonably failed to take advantage of the preventive or corrective opportunities that the Postal Service provided. Appellant contends that she did not want to report the harassment because it made her uncomfortable and she feared negative repercussions at her job. See, e.g., J.A. 58 ("I didn't want to . . . ruffle any feathers,

---

[4] Appellant claims the policy was not effective and calls the investigation into her case a "sham," but she produces no evidence to support this claim. Appellant's Br. 7. Rather, the evidence shows that management responded rapidly to complaints from another employee regarding Duncan's alleged harassment, and in Appellant's case, Investigator Charles Fiske conducted a thorough yet swift investigation, culminating in Duncan's termination.

14

get anybody mad at me or anything."); id. at 147 ("I don't like confrontation especially with my supervisor who controls my work life.").

However, "an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir. 2001) (internal quotation marks omitted). "Little can be done to correct th[e] objectionable behavior unless the victim first blows the whistle on it. An employee's subjective fears of confrontation, unpleasantness or retaliation thus do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." Id. (alteration and internal quotation marks omitted). Based on this precedent, Appellant's reasons for not reporting the alleged harassment are simply not sufficient.

For these reasons, Appellee has satisfied the elements of the Faragher-Ellerth affirmative defense, and Appellant cannot defeat the motion for summary judgment.

                                IV.

For the foregoing reasons, we affirm the district court.

                                                    AFFIRMED

15