NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0069n.06

Case No. 21-5359

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

RONALD BURNS,

  Plaintiff - Appellee,

v.

BERRY GLOBAL, INC.,

  Defendant - Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

FILED
Feb 07, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY

Before: GIBBONS, ROGERS, and NALBANDIAN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellant Ronald Burns was employed as a maintenance technician by defendant-appellee Berry Global, Inc. ("Berry"), where he was the victim of four instances of racial harassment. Between August 7 and August 24, 2018, Burns found an offensive note, a noose, and a written threat in his locker. Burns was deeply troubled by these instances and reported them. Berry launched an inconclusive investigation that failed to identify the harasser. In January 2019, Burns discovered another noose and resigned soon after this incident.

Burns sued Berry, alleging he was discriminated against based on his race in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the Kentucky Human Rights Act, and the United States Equal Employment Opportunity Act. At the close of discovery, Berry filed a motion for summary judgment. Finding that the coworker standard of review applied to Burns's

claims and that Berry's response to the harassment was legally sufficient, the district court granted summary judgment in favor of Berry. We affirm.

I.

Burns began working at Berry's Nicholasville, Kentucky, manufacturing plant ("the facility") in January 2018 through Aerotek, a temporary employment agency that contracted with Berry. Berry hired Burns as a full-time maintenance technician on August 6, 2018. The facility employed around fifty people, many of whom were split among four production shifts that worked either 8:00 a.m. to 8:00 p.m. or 8:00 p.m. to 8:00 a.m. Shifts 1 and 2 worked the daytime shift, and shifts 3 and 4 worked the night shift. During Burns's tenure, the facility employed around five maintenance technicians; usually, two worked the day shift and one worked the night shift alone. Burns worked the night shift.

A.

On August 7, 2018, Burns returned to his locker at the end of his night shift and found a piece of cardboard with "dance monkey" written on it (the "offensive note").[1] DE 32-14, Burns Dep., Page ID 1288. Burns brought the note to plant manager John Edwards, and he told Edwards the note was not in his locker when he started his shift. Edwards asked Burns if he thought it was "some type of slang" and insinuated it was "like a high school prank." *Id.* at 1295. Edwards also told Burns he could "handle [his] own if there was a situation that occurred and someone wanted to be physical." *Id.* at 1335. At the time, Burns did not tell Edwards he thought the note was racially motivated. Edwards reported the incident to the facility's Human Resources Generalist Jamie Long.

---

[1] Burns received two notes while employed at Berry. The district court referred to the first note as the "offensive" note and the second note as the "threatening" note. Both notes are offensive *and* threatening, but we mirror the district court's labels.

Long contacted her direct superior, Human Resources Manager Sharon Johnson, to discuss the situation. Long and Charlie Bowman, Burns's maintenance supervisor, began reviewing security camera footage to attempt to determine who entered the locker room prior to Burns's discovery of the note. The facility had a camera pointed at a time clock that captured employees from the waist down as they entered and exited the men's restroom, which leads to the locker room. Long spent "several days" attempting to match outfits of employees entering the restroom to footage from other areas of the plant. DE 32-20, Long Dep., Page ID 1968.

After contacting Long, Edwards claims he met with shift 3 the following morning, at 8:00 a.m. on August 8, with Burns present. Edwards "advised this type of harassment would not be tolerated." DE 32-21, Long Ex., Page ID 2110. Burns denies being present for any conversation of this sort, stating he did not witness Edwards meet with any employees about the offensive note.

B.

Around 8:00 a.m. on August 11, 2018, Burns was gathering his belongings from his locker at the end of his shift when he got a text from the day shift maintenance technician. The day shift technician was running late and asked Burns to cover for him. Burns went back to his locker around an hour later and discovered a noose hanging from the lock on the locker (the "first noose"). Burns took a photo of the noose and went to notify a supervisor. Not seeing Bowman in his office, Burns looked for the "next person with authority or supervision" and found Jeff Bell, the day shift production supervisor and the only supervisor in the facility that Saturday morning. DE 32-14, Burns Dep., Page ID 1305–06. Burns and Bell removed the noose from Burns's locker.

Burns texted a picture of the noose to Long, who called him to get more information. He described the incident, requested the number of the ethics hotline, and asked Long to look into the situation. Burns called the ethics hotline to report the incident. At some point, Burns spoke with

Edwards, who told him to "come into work, be safe, kind of keep [his] head down, and pretty much keep quiet about the situation." *Id*. at 1316. Burns was allowed to take off the rest of the weekend after expressing that he did not feel safe at work.

At this point, the investigation expanded to include both instances of racial harassment. Edwards claims he spoke with shift 1, the only group that could have accessed the locker room during the relevant time frame, and told them "this type of harassment was not going to be tolerated." DE 30-3, Edwards Dep., Page ID 448. Edwards also sent an email instructing supervisors to walk through the locker room before and after their shifts to look for "any offensive items" and to "report any issues." DE 32-18, Edwards Email, Page ID 1772.

Between August 7 and August 14, Long continued reviewing camera footage. She spoke with Burns twice, conversations in which Burns was able to ask for "updates on the investigation." DE 32-14, Burns Dep., Page ID 1317. By August 13, Long narrowed the likely harasser down to three sets of clothes and, by reviewing footage from other cameras in the facility, matched those clothes to three employees. Long interviewed nineteen employees from shifts 1 and 3 over three days, beginning on August 14. Long worked with Johnson to draft the interview questions. She asked each employee three questions: "Have you seen anything questionable?"; "Have you heard anything to make you uncomfortable?"; and "Have you seen anything offensive?" DE 32-20, Long Dep., Page ID 1979. During the interviews, Long did not show the employees a picture of the offensive note or the first noose.

The interviews concluded without yielding a suspect. In addition to the locker room walkthroughs, Berry took several steps to prevent a future incident. The camera outside the men's restroom was adjusted to capture full-body images of employees entering and exiting. The facility ordered new lockers, which were to be placed in a new location fully visible by camera. Long also

attempted to set up an employee recognition team to address the "morale issues" discovered during interviews, but lack of interest and participation caused this idea to fail. DE 32-20, Long Dep., Page ID 2064; *see also id.* at 1989, 2063; DE 30-6, Edwards Dep., Page ID 491.

On August 21 and 23, 2018, Berry conducted a "Refresher Code of Respect Training." The parties vigorously debate the contents of this "training." Berry claims it conducted a refresher training with all employees on the company's code of respect and nonharassment policy prior to a regularly scheduled "lockout/tagout" training. Each employee that attended the training signed a roster on which Long handwrote "Refresher Code of Respect Training Nonharassment and [D]iscrimination" at the top. Burns disputes whether racial harassment was ever discussed at this meeting. Burns signed the roster but does not recall a discussion on discrimination or nonharassment, and he also claims Long's handwritten heading was not there when he signed it. Burns recalls a five-minute discussion in which Long "flashed" a PowerPoint slide with the offensive note on it and "spoke on defacing company property and how it would not be tolerated." DE 32-14, Burns Dep., Page ID 1325.

After the lockout/tagout training, Burns met with Long and Johnson. He asked whether Berry had counseling services for employees; Long and Johnson directed him to Berry's Employee Assistance Program, and Long suggested that she and Burns meet once a week. Burns also asked for updates on the investigation, but no updates were given to him at that time.

## C.

On August 24, 2018, Burns discovered a piece of cardboard in his locker with "die n*****" written on it (the "threatening note"). DE 32-14, Burns Dep., Page ID 1338. Burns brought the note to the night shift supervisor, Donnie Conatser. Conatser notified Edwards, Edwards called Long, and Edwards and Long came to the facility in the middle to the night to investigate. Burns

suspected the note was placed in his locker between 7:47 p.m. and 9:12 p.m. Supervisors had been instructed to conduct locker room walkthroughs at this time, but there is no documentation of any walkthroughs between 7:00 p.m. on August 24 and 8:00 a.m. the next morning. The "Locker Room Walk Thru" sheets show Bell conducted walkthroughs on August 24 until 7:00 p.m. and resumed on August 25 at 8:00 a.m.

After reviewing camera footage for the time frame Burns identified, Berry management narrowed it down to one employee who could have been present in the locker room for all three incidents, Jeremy Morton. Edwards, Bowman, and Conatser brought Burns into Long's office to discuss the identification of Morton as a suspect. Burns was informed that Morton would be immediately suspended pending investigation. Conatser went to remove Morton from the production floor, and while Morton was being escorted out, he passed Burns, Edwards, and Bowman. According to Burns, Morton was "very aggressive towards [him], making threats and just [being] very irate." *Id*. at 1318. Burns and Bowman returned to Bowman's office and called the police. An officer came to the facility and spoke with Burns about all three instances of racial harassment. Bowman then followed Burns home to make sure he made it safely.

The investigation was reopened. Beginning on August 29, five days after the threatening note was discovered, Long reinterviewed employees on shifts 1 and 3. She asked them the same three questions as before, without showing any employees the note. With both instances, Long claimed showing the employees photos of the harassing notes and noose was unnecessary because "[t]hey were aware." DE 32-20, Long Dep., Page ID 2035. She explained that it is a small facility, so "[e]verybody knew what incidents were occurring." *Id*. The interviews yet again failed to yield any leads as to the harasser's identity.

After Morton was suspended, Bowman mentioned to Burns that Bell was a possible suspect. Although Bowman never explained why Bell was a possible suspect, Bell was previously accused of racism at Berry. In January 2018, an employee named Eric Shepard accused Bell of "showing favoritism" on his shift by assigning him to a certain line and of being racist. DE 32-11, Edwards Email, Page ID 1250. Shepard brought his concerns to Edwards, who met with Bell and notified Johnson of the accusation. Bell told Edwards he liked Shepard and assigned him to Line 19 based on his experience and capabilities. After her conversation with Bell, Johnson followed up with Shepard, who "stated things were better and that he was very pleased with the outcome of Berry's response." DE 33-3, Johnson Decl., Page ID 2525.

On August 30, 2018, Long informed Burns there was insufficient evidence to connect Morton to the harassment.[2] During this conversation, Long reassured Burns the locker relocation project would continue. At some point, Long also offered Burns the opportunity to transition to the day shift, but he declined the offer. There is no indication Berry attempted to conduct further antidiscrimination or nonharassment training in response to this incident. Burns met with Long on September 4. She informed him the new lockers arrived; he informed her "things [were] about the same." DE 30-6, Long Notes, Page ID 966. The two did not have any additional meetings. Several months then passed without an incident targeting Burns.

D.

Burns was again the victim of racial harassment in January 2019. On January 14, Burns was on call and came in to fix a machine that had broken down. When he arrived, his toolbox was partially covered with a rag—something that was "nothing out of the ordinary, so [Burns] didn't

---

[2] Although Berry asked Morton to return to work, he declined and terminated his employment with Berry. The police investigation, although inconclusive overall, also ruled Morton out as the perpetrator.

really think anything of it." DE 32-14, Burns Dep., Page ID 1364. After removing the rag, Burns noticed a noose in the vise of his toolbox.[3]

Burns called Jordan Fields, the night shift production supervisor on duty, over to look at what he found. Fields then realized he had unknowingly moved the noose earlier in the evening to use the vise. When Fields found it, the noose was tightened inside the vise on Burns's toolbox. Fields and Burns reconstructed the scene as Fields found it, and they took photos.

Fields and Burns reported the incident to Long and Edwards. Edwards called Burns, who told Edwards he thought the incident was racially motivated. That night, Fields and Burns reviewed the video footage but were unable to determine who placed the noose in Burns's toolbox, in part because the toolboxes were not in view of a camera. Edwards and Long began interviewing employees the next morning. Unlike the previous interviews, in which no images of the notes or noose were shown, employees were shown a picture of the second noose. And the questions were slightly different—they asked: "Have you seen anything about this issue?" and "Have you seen heard [sic] anything about this issue?" DE 32-10, Edwards Notes, Page ID 1243–48. Employees were also instructed to follow up "if they hear anything." *Id*. at 1248.

The maintenance toolboxes were moved to an area in view of a camera. Supervisors were instructed to "look for any odd items such as slip knots hanging off items and any other potential problems that could be construed as harassment in any manner." DE 32-19, Edwards Email, Page ID 1826. Edwards also unsuccessfully reviewed the camera footage. On January 22, 2019, Long advised Burns the investigation was complete and inconclusive as to whether the incident was a coincidence or a "motivated act." DE 32-23, Long Notes, Page ID 2285. Burns did not remain at

---

[3] Berry's maintenance toolboxes are large, wheeled carts. Although employees' names are not printed on the toolboxes, Burns's was the only one with a vise attached to it.

Berry much longer. After the second noose incident, he began looking for employment elsewhere. Once he found a new job, he resigned on March 5, 2019.

Burns sued Berry on February 6, 2020, asserting claims for racial discrimination in employment, hostile work environment, employment retaliation, and constructive discharge. He brought his claims under 42 U.S.C. § 1981, 42 U.S.C. § 2000e (Title VII of the Civil Rights Act), the Kentucky Civil Rights Act, and the United States Equal Employment Opportunity Act. The district court granted summary judgment to Berry, finding the supervisor standard of review does not apply to Burns's claims and, under the coworker standard of review, Berry's response was reasonably adequate. The district court additionally found Burns was not constructively discharged because his racial discrimination claim failed.

## II.

We review a grant of summary judgment de novo, "drawing all reasonable inferences in favor of the non-moving party." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). "Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment is not proper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "employees [have] the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). To succeed on a hostile work environment claim, the employee must establish (1) he was a member of a protected class; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on race; (4) the harassment created a hostile work environment; and (5) the employer is liable for the harassment. *Hafford v. Seidner*, 183 F.3d 506, 512 (1999). Here, only the employer's liability is at issue.

The standard for evaluating the employer's liability depends on whether the harasser is a supervisor or a coworker. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.* But if the harasser is a supervisor and the "harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* If no tangible employment action is taken, the employer may establish an affirmative defense by showing that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.*

## A.

Both parties acknowledge the harasser was never identified, so neither supervisor nor coworker harassment can be ruled out. Burns claims Berry ignored substantial evidence that a supervisor, Jeff Bell, was responsible. On appeal, Burns and Berry dispute whether alleged harasser Jeff Bell was Burns's supervisor under Title VII. An employee is a "supervisor" for Title VII purposes "if he or she is empowered by the employer to take tangible employment actions

against the victim." *Vance*, 570 U.S. at 424. "Tangible employment actions are those that 'effect a significant change in employment status . . . .'" *EEOC v. AutoZone, Inc.*, 692 Fed. App'x 280, 283 (6th Cir. 2017) (quoting *id*. at 431).

The district court concluded Bell was not a supervisor because Burns provided "no responsive evidence that could lead a jury to find that Bell was his supervisor." DE 35, Mem. Op. & Order, Page ID 2562. In his deposition, Burns—a maintenance department employee who typically worked the night shift—identified Bell as the "day shift production supervisor." DE 32-14, Burns Dep., Page ID 1305; *see also id.* at 1356 (describing Bell as "the day shift guy"). Burns also stated he "didn't really speak with Jeff much," but when he did, it was to share information that might be relevant to the day shift. *Id.* at 1356 (explaining that when Burns spoke with Bell it was to share information like "this machine broke down and you might want to keep an eye on it"). Burns identified Charlie Bowman as his only supervisor while at Berry. *Id.* at 1277. Given the above, the district court concluded Bell did not supervise Burns.

We agree. Berry included an affidavit by Long with its reply to Burns's response to its motion for summary judgment, in which Long declared that Bell had no authority to hire, fire, promote, demote, or transfer any employees and had no supervisory authority over Burns. Relying on Burns's own testimony and Long's affidavit, there is no indication Bell had authority to take tangible employment actions against Burns. No reasonable juror could find a night shift maintenance technician was supervised by a day shift production supervisor with whom the technician rarely interacted or communicated. Moreover, Burns repeatedly testified Bowman was his supervisor. Because Bell was not Burns's supervisor under Title VII, the supervisor standard of review does not apply. Thus, the district court correctly applied the coworker standard of review.

B.

Having ruled out supervisor liability, we analyze whether Berry can be held liable under the coworker standard of review. The district court found Berry's response to the incidents of racial harassment was reasonable and accordingly granted summary judgment on Burns's claims. DE 35, Mem. & Op., Page ID 2563. Given the steps taken by Berry in response to the racial harassment—including listening to Burns, promptly launching an investigation, and taking preventative action—no reasonable juror could find Berry's response unreasonable. Therefore, the district court's grant of summary judgment was proper. We affirm.

To hold an employer liable for the harassing conduct of an employee's coworker, the employee must show the employer's response to the harassment "manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008) (internal quotation marks omitted); *see also Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013); *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999) (requiring plaintiff to show employer "tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action" (internal quotation marks omitted)). An employer's response is generally adequate "if it is reasonably calculated to end the harassment." *Jackson*, 191 F.3d at 663 ("Significantly, a court must judge the appropriateness of a response by the frequency and severity of the alleged harassment."). This court has identified steps that may "establish a base level of reasonably appropriate corrective action," including "promptly initiating an investigation to determine the factual basis for the complaint, speaking with the specific individuals identified by the complainant, following up with the complainant regarding whether the harassment was

continuing, and reporting the harassment to others in management." *Waldo*, 726 F.3d at 814 (internal quotation marks and brackets omitted).

Berry's response to the racial harassment was adequate because it took prompt action reasonably directed at determining the source of the harassment by listening to Burns, conducting a timely investigation, interviewing those potentially responsible, and following up with him frequently. Other factors that made Berry's response adequate include giving Burns two days off after the first noose was discovered, warning shift employees that Berry did not tolerate harassment, completing pre- and post-shift locker room walkthroughs, adjusting security cameras, making plans to relocate lockers, suspending a potential suspect, and offering Burns a transition to the day shift. On appeal, Burns argues Berry's response to the racial harassment was unreasonable because Berry failed to conduct any harassment, discrimination, or sensitivity training; did not immediately conduct witness interviews; and allowed Long to conduct a second substandard investigation after the threatening note was discovered.

First, Burns emphasizes that Berry failed to implement additional training in response to the incidents of racial harassment. More specifically, Burns claims the refresher training that Berry held on August 21 and 23 had nothing to do with antidiscrimination and nonharassment. Berry says otherwise. In any event, we need not resolve this factual dispute here because Burns does not point to any case law requiring an employer's response to include additional harassment, discrimination, or sensitivity training. Indeed, Berry had already provided relevant training through its onboarding process. Berry required employees to complete "Berry University" when hired, which covered the company's antidiscrimination and nonharassment policies. Berry also required new hires to sign a statement acknowledging they understood the company's Code of Respect; Equal Employment Opportunity policy; and Non-Harassment, Discrimination, and

Retaliation policy. Given the other aspects of Berry's response, the contents of Berry's post-incident training do not change the outcome.

Second, Berry's delay in interviewing employees does not render the entire investigation unreasonably delayed. Burns argues Berry's delays in conducting interviews after the offensive note was discovered were unreasonable. He also argues Berry's claim that the delays were "attributable to logistical issues" is "contrary to the evidence" because "Berry began employee interviews only hours after the second noose was discovered." CA6 R. 16, Appellant Br., at 25. Whether a delay "constitute[s] an unreasonable failure to take prompt corrective action" is a case-by-case inquiry. *Stevens v. U.S. Postal Serv.*, 21 Fed. App'x 261, 264 (6th Cir. 2001); *see Zeller v. Canadian Nat'l Ry. Co.*, 666 Fed. App'x 517, 526 (6th Cir. 2009) (finding employer's investigation prompt when it began "the next week" after employee reported the incident).

Interviews were not the only component of Berry's investigation following discovery of the offensive note. Long immediately began reviewing video footage, and then she interviewed employees. Additionally, Berry explained interviews took time to schedule because Long needed to coordinate with supervisors among different shifts to ensure that an employee could be pulled off the floor for an interview. As the severity of the harassment increased, so too did Berry's response and, when the second noose was discovered, Edwards began interviewing employees immediately. Under these circumstances, Berry did not unreasonably delay interviewing employees. Taken as a whole, Berry's investigation and corrective action were promptly launched and implemented.

Third, Burns alleges Berry allowed Long to conduct the "same substandard investigation" after the threatening note was found. He argues that she was unqualified and alleges that Berry failed to adjust its response when faced with the more severe threatening note. Long may not have

been a perfect investigator, but she did not investigate these instances of racial harassment by herself. Long was assisted by her superiors and various supervisors in the plant. Berry's decision to allow its HR Generalist to continue the investigation, rather than an outside attorney or investigator, was not unreasonable. Burns points to no case law requiring outside involvement or indicating Long was unqualified as a matter of law.

Title VII requires a reasonably prompt corrective response, not a perfect response. Burns undeniably suffered heinous racial harassment while employed by Berry. But Berry took prompt—if shy of perfect—action that was reasonably directed at determining the source of the harassment. *See Waldo*, 725 F.3d at 814. Because no reasonable juror could find Berry acted unreasonably or in a deliberately indifferent manner, we affirm the district court's grant of summary judgment.

## C.

Burns alleges he was constructively discharged from Berry because the instances of racial harassment created an intolerably hostile work environment that forced his resignation. "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (internal quotation marks omitted). To demonstrate constructive discharge, an employee must show "1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Id*. at 728. Constructive discharge presupposes a successful claim of racial discrimination because it requires an employer to have "deliberately create[d] intolerable working conditions, as perceived by a reasonable

person, with the intention of forcing the employee to quit and the employee must actually quit. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Burns's underlying claim of racial discrimination fails because Berry cannot be held liable for the harassment under the coworker standard of review. Additionally, the actions Berry took to address the harassment indicate Berry did not deliberately create intolerable working conditions. Berry's investigation and corrective efforts, such as moving the lockers, providing counseling, redirecting cameras, and suspending a suspect immediately, indicate Berry had no intention of forcing Burns to quit. Burns did not proffer evidence showing Berry deliberately created intolerable working conditions or that it did so with the intention of forcing Burns to quit. Because Burns's constructive discharge claim lacks merit, the district court properly granted summary judgment to Berry on this claim.

### III.

Ronald Burns suffered intolerable racial harassment at work on account of his race. His employer, however, cannot be held legally responsible under the coworker standard of review. Berry's response, though perhaps imperfect, was legally adequate under the requirements of Title VII and its progeny. The district court properly granted summary judgment to Berry on Burns's claims. We affirm.