In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00222-CV**
_____

**COLLEEN PAIGE SIMMONS, Appellant**

**V.**

**TOP DECK, INC., Appellee**

On Appeal from the 128th District Court
Orange County, Texas
Trial Cause No. A200814-C

**MEMORANDUM OPINION**

Colleen Simmons ("Simmons") sued her former employer, Top Deck, Inc.

("Top Deck"), for employment discrimination, alleging that a Top Deck employee,

Justin Bufford ("Bufford"), sexually harassed her. Simmons based her harassment

claim on two grounds: "quid pro quo sexual harassment" and "hostile work

environment" harassment. *See* Tex. Lab. Code Ann. § 21.051(1). Simmons further

alleged that Top Deck, through Bufford, retaliated against her "because she opposed

1

unlawful discrimination[.]" *See id.* § 21.055(1). Top Deck moved for a traditional and no-evidence summary judgment, and the trial court granted the Motion.

In a single appellate issue, Simmons contends that genuine issues of material fact preclude the summary judgment; she therefore asks us to reverse the trial court's judgment and remand the matter to the trial court. Since we conclude that no genuine issues of material fact exist regarding Simmons's claims, we affirm.

## I. Background Information and Summary Judgment Evidence

Top Deck supplies temporary labor to paper mills. Simmons testified that she understood the company was operated by owner, J.W. Dalton, his sons, Jake Dalton ("Dalton") and Bufford, and Bufford's sister, Jamey MacFarlane.

In April 2019, Top Deck hired Simmons to work as a hole watch or fire watch, and Simmons worked in that capacity for approximately one month. Simmons contends that Dalton led her to believe that the work would be steady, with "lots of overtime," but Top Deck contends it assigned work based upon the requests of its clients on an "as needed" basis. Simmons contends that Top Deck stopped giving her work assignments because she did not comply with Bufford's express request that she send him a photograph of her breasts.

In August 2019, Simmons filed a formal charge of sex discrimination with the EEOC alleging that Top Deck, through Bufford, sexually harassed her and retaliated against her for opposing Bufford's conduct. The EEOC investigated and dismissed

2

the charge, regarding an alleged violation of Title VII, finding the evidence was not sufficient to continue the investigation. The Texas Workforce Commission Civil Rights Division accepted that finding and then issued a Notice of Complainant's Right to File a Civil Action.

When the Texas Commission on Human Rights issued the Notice of Complainant's Right to File Civil Action, she did so, alleging the following: 1) that she was not provided steady work because she refused to provide sexual favors for Justin Bufford, a Top Deck supervisory employee; 2) that Top Deck subjected her to a hostile work environment because her submission to Bufford's pervasive and severe sexual harassment altered the terms or conditions of her employment; and 3) that Top Deck retaliated against her (by giving her no work assignments) when she opposed the alleged discriminatory practices. Top Deck sought and received a summary judgment on all Simmons's claims, and this appeal ensued.

## A. Colleen Simmons's Contentions

Simmons testified in her deposition that she was a convicted felon who had recently been released from the SAFP program[1] and was seeking a job when she was hired by Top Deck. Simmons testified that she and Bufford reported to the same probation officer, and that officer told Simmons that Top Deck was hiring and suggested that Simmons apply for work there. Simmons did so and she was hired to

---

[1] SAFP is an acronym for Substance Abuse Felony Program.

3

work as a fire watch person and worked for Top Deck for about one month, from April 8, 2019, to May 8, 2019.

According to Simmons, Bufford made inappropriate comments to her during the hiring process. Specifically, Simmons claims Buford asked her whether her breasts were real, mentioned that his wife had undergone breast augmentation surgery, and made a comment about the feel of natural breasts. Simmons testified she considered these comments inappropriate, but she agrees she did not voice any opposition to them by speaking to either Bufford, her job supervisor, Chris Hantz, Top Deck's Human Resources Department, or Top Deck management.

Simmons and Bufford communicated by text message about her job assignments. Many of these messages are related to work schedules and transportation and are dated in the April-May 2019 time period. In July 2019, Simmons and Bufford exchanged text messages that contain sexual content or innuendo. While Simmons testified that she could not remember the dates of the text messages, Simmons admits she voluntarily joined in the back and forth banter. Simmons acknowledged that Bufford did not proposition her for sexual activity. In addition, she admitted that she participated in the sexual banter when she offered information about her chest size without a request from Bufford in one of the July 2019 exchanges:

> Q. What -- what motivated you to send him a text telling him your chest size?

4

A. Well, I mean, like I said before, I was just -- in the beginning I was kind of just playing – just going with it. You know what I mean? I was just kind of -- I don't really know.

During July 2019, and after Simmons failed to show up for a job, Bufford admits he made some requests to Simmons to send him photographs of her breasts as a part of the sexual banter with Simmons. In one series of text messages, the two of them discuss his sex life with his wife, and Bufford told Simmons that he would be willing to pay for "a blow job." At one point, Simmons states, "it's hard[,]" and Bufford responds, "not yet haha." Also in July 2019, as part of the voluntary sexual banter, Simmons requested Bufford to "get me a job[,]" Bufford responds, "Well you don't have to wait [to] send those [pictures of her breasts] anytime lol[.]"[2] In another exchange, Simmons states "[n]eed a [expletive] job bad[,]" and Bufford replies "I know wish I had something. I need a job too lol[.]" Simmons then states, "Lmao [laughing my a.. off] I know what that JOB is lol[,]" to which Bufford answers, "involves blowing lol[.]" In other messages, Bufford told Simmons, "[w]ell send boob pics when you ask for work next time lol[,]" and "[s]ee I remembered you without a boob pic or bj so be happy lol[.]" Simmons admits she told Bufford her bra size. In her deposition, Simmons testified that Bufford's comments made her feel "like scum" and "this big[.]" However, Simmons then admitted when asked:

---

[2] Bufford confirmed that "lol" stood for "laughing out loud."

5

"But you [Simmons] never placed a call to the company office to ask questions?" Simmons stated, "No, I hired a lawyer."

She went on to admit in cross-examination during her deposition that she had decided not to go back to work for Top Deck on June 10, 2019, which is when she failed to show up for an assignment made by Bufford. She explained that, before June 11, 2019, she was no longer going to work there when asked, "Well, but you've [Simmons] already told me repeatedly that if Top Deck had offered you a job you weren't going to show up." Simmons responded, "Right."

As for the timing of the sexual text messaging episodes, Simmons stated in her deposition "I don't know what date he was texting…." Simmons acknowledged that she did not tell Bufford to keep the communication professional and did not complain to Top Deck management about Bufford's alleged sexual harassment. Simmons agreed that Top Deck provided her with a copy of its Employee Handbook & Safety Manual and understood Top Deck had a policy against sexual harassment and a complaint procedure directing employees to report sexual harassment to their supervisor. Simmons also admitted that:

> Q. And you understood that if you had a complaint relating to sexual harassment, you were supposed to take that to your supervisor?
>
> A. Right, which was in my -- I thought was Jake. I mean, I've been on the plant jobs before, and I know what you're supposed to do. You're supposed to turn it in to HR, you know, if anybody (sic) sexual nature or anything like that. I've been through that before.

6

**B. Top Deck's Defenses**

In its summary judgment motion, Top Deck advances multiple defensive theories. Top Deck's arguments include: 1) Bufford never made or withheld work assignments based on sexual favors; 2) any arguably offensive statements made by Buford were "nothing more than 'simple teasing,'" and were not sufficiently severe nor pervasive to render the work environment hostile; and 3) that Bufford was not a supervisor. Top Deck also argues the affirmative defense set forth in *Faragher v. City of Boca Raton* and *Burlington Industries, Inc. v. Ellerth*, applies to Simmons's harassment claim because Simmons unreasonably failed to take advantage of Top Deck's reasonable efforts to prevent and remedy sexual harassment.[3] *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). Top Deck further contends that Simmons did not engage in a protected activity and her retaliation claim should also fail as a matter of law.

Top Deck relies on affidavits and depositions of Bufford, MacFarlane, Simmons, and Project Manager Chris Hantz, as well as its records, data compilations, and documentation showing relevant text messages. Simmons's

---

[3] "One express purpose of the state Act is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments.' Sexual harassment is a recognized cause of action under Title VII and the TCHRA, and Texas courts look to analogous federal law in applying the state Act." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010) (citations omitted).

deposition is summarized above, and we summarize Top Deck's remaining evidence below.

### 1. Justin Bufford's Deposition

When Bufford began working for Top Deck, he worked first as a painter, then as a millwright. In 2019, when Simmons worked for Top Deck, Bufford was a recruiter, and he still held this position at the time of his March 2022 deposition. As a recruiter, Bufford seeks people to fill needed positions. In 2019, he reported to Ashley Steiner, the HR Manager. Top Deck's job description for an HR Recruiter, which Bufford verified was accurate, summarized the job and listed the essential duties and responsibilities as follows [spelling and punctuation as original]:

> Job Summary
> The main responsibility for this role is to source and identify craft specific talent, fill all job openings, assure fair compensation practices and perform general administrative duties for the HR manager and employees as duties are assigned.
>
> Essential Duties and Responsibilities:
>
> 1. Recruit craft specific talent desired by Managers for certain projects.
> 2. Post positions on social media to bring in applicants.
> 3. Ensure that personnel requisitions are completed in a timely manner.
> 4. Obtain job descriptions from Managers.
> 5. Work with the Manager's [sic] to determine the required craft and how many workers are needed.
> 6. Manage the requisition log and applicant/interview/hire reports.
> 7. Ensure all paperwork is filled out correctly.
> 8. Set up drug screens

8

9. Ensure employee training has been completed and is up to date.
10. Administer immigration paperwork.
11. Ensure a list of job applicants are [sic] sent over to Manager's [sic] for approval and final employee list.
12. Enter new hire information into system and send file over to the HR Manager for entry approval.

Bufford testified that the hiring process includes paperwork and a drug screen. He stated that if the paperwork was complete and the drug test results were negative, the job applicant was hired. Bufford recalled Simmons applying for work at Top Deck. Since Bufford knew that the Evadale paper mill needed hole watch and fire watch workers, he hired Simmons. From April 8, 2019, through May 8, 2019, Simmons worked several days at the paper mill according to Bufford's reading of Top Deck's time records. It was Bufford who scheduled Top Deck employees [including Simmons] to work there. Bufford testified that the superintendent at the Evadale job site where Simmons was scheduled to work was Chris Hantz. His job was to write the names of the personnel he was scheduling for the next day, take a photo with his cell phone, and send it to Chris Hantz, the superintendent who ultimately decided who would be on his crew.

Bufford confirmed that Simmons had been provided the employee handbook, as evidenced by her signature. He testified that he has read the handbook, including the portion addressing sexual harassment, but he played no part in drafting that policy and has received no other training in sexual harassment prevention. Bufford

9

testified that neither Simmons nor any other Top Deck employee received sexual harassment prevention training besides being required to read and acknowledge understanding of the handbook. He could not state whether Simmons had received the five-page sexual harassment policy initially issued September 22, 2015, but assumed that she had been given one even though he had not seen her signed acknowledgement of receipt.

When asked about the text messages between himself and Simmons, Bufford verified the content of the screen shots. He conceded that some of his text messages with Simmons were unprofessional and said he deleted some of the messages so that his wife would not see them. Bufford admitted that the text messages were "[s]omewhat" sexual and "unprofessional" but denied realizing that he was violating Top Deck's sexual harassment policy. Bufford testified that it was Simmons, not he, who brought up the subject of her breasts during one of the July 2019 sexual texting episodes. He admits that, once she brought it up, he asked her about it.

**2. Justin Bufford's Affidavit**

In addition to the material addressed in his deposition excerpt, Bufford's affidavit denies that he touched Simmons, requested sexual favors from her, or that he asked whether her breasts were real. He also denied telling Simmons that his wife had "fake boobs." Bufford further denied that Simmons ever expressed any offense at Bufford's words or conduct. Although Bufford acknowledged that, in July 2019,

10

he exchanged text messages with Simmons, he interpreted those exchanges as "silly, casual banter" rather than as offensive or objectionable harassment.

Bufford denied having supervisory authority on behalf of Top Deck, in that he "did not give Simmons any instructions about how to do her job at the WestRock paper mill." He denied excluding Simmons from a job in DeRidder, Louisiana for any improper reason, such as her gender or her decision not to cooperate with his "alleged requests for sexual favors[.]" Instead, according to Bufford, Top Deck had short notice of the DeRidder job, which required helpers rather than hole watch employees like Simmons. Bufford further explained that Simmons had not yet received site orientation for the DeRidder facility, and she could not go to Louisiana without her probation officer's consent. Bufford told Simmons at the time that he assigned "the first 5 I'd heard from recently" to the DeRidder job. Several of those who were assigned were females.

On August 1, 2019, the date Top Deck received Simmons's discrimination charge, Bufford's supervisor, Ms. Steiner, demanded to see Bufford's phone. She printed the text messages between Bufford and Simmons. She also instructed Bufford to write a statement about the interactions between Bufford and Simmons, which he did. In his August 2, 2019 statement, Bufford indicated, among other things set out in his deposition and affidavit, that he remembered Simmons, stating that he told her "see I remembered you even after our personal conversations[,]" although

11

Bufford's original text message to Simmons reads "[s]ee I remembered you without a boob pic or bj so be happy lol[.]"

Several days later, Steiner advised Bufford that he had not sexually harassed Simmons but his text exchanges with her were unprofessional. Bufford's work area was temporarily relocated so that Top Deck personnel could monitor his conduct; Top Deck also required Bufford to complete additional sexual harassment training.

### 3. Chris Hantz's Affidavit

In his affidavit, Hantz states that from April 1, 2019, through August 31, 2019, he worked for Top Deck as the project superintendent at the WestRock paper mill in Evadale. In his capacity as project superintendent, Hantz, rather than Bufford, supervised all Top Deck personnel working at the paper mill. Hantz stated that an HR recruiter "plays no part in" directing or evaluating employees, and lacked the authority to promote, demote or terminate any Top Deck employees or to determine their pay. Hantz did, however, acknowledge that Bufford's role required him to "locate people available and willing to fill the positions for the project." Bufford also was "permitted to consider new applicants or assign people previously hired who were coming off projects then winding down." According to Hantz, Top Deck's procedures did not require Bufford to assign personnel to project jobs in any particular order.

Hantz described Top Deck's personnel decisions as dependent on its customers' needs at any given time. For example, he stated that a paper mill performing a maintenance shutdown might ask Top Deck to provide scaffold builders, millwrights, or other skilled craftsmen. It also might ask Top Deck to provide support personnel, such as helpers, laborers, or hole watches. These employees are hired on a temporary basis as dictated by the project scope and duration. The WestRock paper mill in Evadale was the sole paper mill for which Top Deck provided hole watch or fire watch services during the summer of 2019 and it has not provided those services since losing the contract in August 2019.

Hantz stated that he had the duty to hire, fire or discipline the employees at the project under his supervision—not Bufford. Hantz stated, and identified in the documents, that his cell phone number was given to all employees, both verbally and in writing, informing the employees to report to him if they had "any problems" on the job. Hantz further stated that despite Simmons having his mobile telephone number, she "never contacted [him] to make any complaints of any kind about Justin Bufford[,]" and he was unaware of allegations that Bufford had discriminated against Simmons or others. According to Hantz, "Simmons was assigned to work on six of the seven projects requiring hole watches during the shutdown." The seventh project "overlapped with a project [Simmons] already was assigned to work."

**4. Jamey MacFarlane's Affidavit**

In her affidavit, McFarlane states that she has been Top Deck's office manager since 2009, and she provides an overview of Top Deck's business practices including its sexual harassment policy. She authenticated job descriptions for HR Recruiter (Bufford's position) and fire watch/hole watch (Simmons's position). Among other duties for Bufford, his job duties provided that he should "[e]nsure a list of job applicants are sent over to Manager's for approval and final employee list." She confirmed portions of Hantz's affidavit regarding Simmons's failure to complain and Bufford's lack of supervisory authority. MacFarlane noted that the job in DeRidder, Louisiana, required only seven helpers and no hole watchers or fire watchers. McFarlane further noted that, of the seven chosen for the DeRidder job, four had longer work histories with Top Deck than did Simmons and there was no requirement to assign persons in any particular order. McFarlane confirmed the sexual harassment policies of Top Deck were supposed to be reviewed by all employees and supervisors and included the following wording at that time:

Sexual and Other Unlawful Harassment

It is the objective of Top Deck, Inc. to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment.

The E.E.O.C. (Equal Employment Opportunity Commission) has provided a broad definition of sexual harassment. It is general in nature and may not always be clear when evaluating everyday situations.

14

"Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature constitute sexual harassment when

1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

2. Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

[sic] access to perform their job functions. Copies will not be distributed to any third party unless mandated to do so by a court of law.

**5. Other Summary Judgment Exhibits**

Top Deck also provided authenticated excerpts of its Employee Handbook and Safety Manual, Simmons's and Bufford's job descriptions, as well as other documentation indicating Simmons was the third-highest-earning employee in her job classification during the month she worked. Top Deck asserts that it did not discriminate against her or retaliate against her as she has alleged.

15

Bufford's job description reflects that he was responsible for "fill[ing] all job openings[.]" The included portion of the employee handbook quotes Top Deck's sexual harassment policy set forth above.

Top Deck's summary judgment evidence includes another sexual harassment policy dated September 22, 2015. This policy states:

> If an employee believes that he or she has been subject to sexual harassment or any unwelcome sexual attention, he or she may address the situation directly and immediately to the harasser, if possible. If the inappropriate conduct does not cease, or if the employee is unable to or uncomfortable with addressing the alleged harasser directly, he or she should report the incident to his or her own supervisor or manager, or to the human resource (HR) director. It is helpful, but not required, to provide a written record of the date, time and nature of the incident(s) and the names of any witnesses.

Unlike the Employee Handbook and Safety Manual, however, the September 2015 sexual harassment policy is not signed by Simmons. However, she stated in her deposition that she knew she was supposed to report sexual harassment to her supervisor, or to "HR," because she had worked in this type of employment before.

Bufford's job description as an HR Recruiter is set out above. Simmons's job description as a hole watch reads as follows [set forth as in the original]:

> Hole Watch
> Hole watch is part of the work associated with confined space work, such as work inside storage tanks or tight spaces between two bulkheads. The team member on hole watch maintains communication with the personnel in the confined space, or hole. In case of an emergency, the worker on hole watch maintains situational awareness and raises the alarm about the emergency. For example, if weather conditions deteriorate and pose a hazard, the worker on hole watch can

16

advise personnel in the hole and assist them in leaving the confined space.

Essential Duties and Responsibilities:

1. Assist welders in surrounding space to ensure safety of employees and equipment
2. Adhere to safety standards as well as daily prep/debrief meeting
3. Watch out for fire hazards in the workplace while work is performed by other employees.
4. Maintain the conditions and requirements stated on the safety permit.
5. Keep flammable materials from ignition sources.
6. In the event of fire, extinguish it immediately or turn a fire alarm on.
7. Stop operations if you find any hazardous condition.
8. Maintain a lookout for small fires started by sparks and bits of slag
9. Sounding alarm, and if possible, attempt to control the fire, should one develop
10. Maintain communication with personnel in the confined space or hole
11. Maintain situational awareness and raise alarm about an emergency

Requirements

1. Must be able to work up to 7 days a week; and/or 8-12 hour a day Shift flexibility; days or nights
2. Over the age of 18 High School Graduate/GED
3. Must be able to pass a Drug & Alcohol Test screening
4. In addition to the above, the position MAY require that employee/contractor be able to: Ascend to heights up to 50 feet or greater using stairs or a ladder
5. Work in a confined space
6. Able to wear the required PPE for extended hours in various types of environmental conditions
7. Stand for a minimum of 2 hours or sit without leaving post until relieved by another attendant.
8. Kneel, crouch or crawl in internal and external environment
9. Have excellent vision and hearing
10. Must be able to follow client written and verbal requirement

## II. Standard of Review

We review summary judgment orders de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When, as here, the trial court's order does not specify the basis of its decision, we must affirm the judgment if any of the movant's theories are meritorious. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). When both no-evidence and traditional grounds for summary judgment are asserted, we first review the trial court's order under the no-evidence standard. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *Werth v. Johnson*, 294 S.W.3d 908, 909 (Tex. App.—Beaumont 2009, no pet.).

To prevail on a no-evidence summary judgment, the movant must allege that no evidence exists to support one or more essential elements of a claim for which the non-movant bears the burden of proof at trial. *See* Tex. R. Civ. P. 166a(i); *Barnes v. Walsh*, No. 09-20-00212-CV, 2023 WL 2417974, at *3 (Tex. App.—Beaumont Mar. 9, 2023, no pet.) (mem. op.). A no-evidence motion may not be conclusory but must instead give fair notice to the non-movant as to the specific element of the non-movant's claim that is being challenged. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310–11 (Tex. 2009). To defeat a no-evidence motion, the non-movant must then present evidence raising a genuine issue of material fact on the challenged elements. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Barnes*, 2023 WL 2417974, at *3. We view the evidence in the light most favorable

18

to the non-movant. *Ridgway*, 135 S.W.3d at 601. A fact issue exists where there is more than a scintilla of probative evidence. *See Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (per curiam); *see also* Tex. R. Civ. P. 166a(i). More than a scintilla of evidence exists if the evidence rises to a level that would allow reasonable and fair-minded people to differ in their conclusions as to the existence of a vital fact. *See Dworschak v. Transocean Offshore Deepwater Drilling, Inc.*, 352 S.W.3d 191, 196 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Ridgway*, 135 S.W.3d at 601).

To prevail on a traditional motion for summary judgment, a movant must establish that no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); and *see Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Summary judgment is appropriate if the movant conclusively negates at least one essential element of the plaintiff's claim. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). Only when the movant meets its initial burden, does the burden shift to the plaintiff to present evidence raising a genuine issue of material fact. *See Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 514 (Tex. 2022) (citations omitted); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018).

"When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (citations omitted). "The appellate court must affirm the summary judgment if any one of the movant's theories has merit." *Id.* (citation omitted). We will therefore consider whether any grounds asserted by Top Deck support the summary judgment.

### III. Quid Pro Quo Harassment

### A. Texas Labor Code Applicable Provision

Section 21.051 of the Texas Labor Code states:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Lab. Code Ann. § 21.051(1), (2).

Courts recognize two types of harassment: "(1) quid pro quo harassment, in which the harasser demands sexual favors as a condition for granting employment

or its benefits, or (2) harassment that creates a hostile or offensive work environment." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 806 (Tex. 2018) (Boyd, J., dissenting).

The elements of a quid pro quo harassment claim are: "(1) [a] supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship." *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 470 (Tex. App.—Austin 2000, pet. denied) (citations omitted).

In the context of an employment discrimination claim, supervisory status is not necessarily limited to the authority to hire, fire, or discipline an employee. *See Vance v. Ball State Univ.*, 570 U.S. 421, 434–35 (2013). Instead, a person is considered a supervisor "if he or she is empowered by the employer to take tangible employment actions against" the target of the harassment. *Id.* at 424. The *Vance* court defined "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429 (quoting *Ellerth*, 524 U.S. at 761). In most cases, a tangible employment action is an action that inflicts direct economic harm. *See Ellerth*, 524 U.S. at 762.

## B. Analysis

Top Deck's Motion for Summary Judgment states that Simmons has presented "no supporting evidence of any conditioned request and no related adverse

employment action." Top Deck further argues that Bufford was not a supervisor, thus negating the initial criterion for quid pro quo liability. We examine the evidence as to each element to determine whether Simmons has "produce[d] summary judgment evidence raising a genuine issue of material fact." *See* Tex. R. Civ. P. 166a(i).

Top Deck contends that Bufford was not a supervisor because he lacked the authority to terminate, promote, demote, or discipline employees and lacked the power to write performance reviews or determine employees' pay rates. Top Deck also argues that Bufford did not direct Simmons's work at the paper mill.

Assuming without deciding that Bufford lacked the power to do any of these things, the definition of "supervisor" in a discrimination case does not necessarily require the authority to terminate, promote, demote, or discipline the employee or direct the employee at work. Rather, if Bufford could assign Simmons to a lower-paying project or if Bufford could decide to assign employees other than Simmons to a project, Bufford could be considered a supervisor under the *Vance* definition of "supervisor." *See Vance*, 570 U.S. at 431.

Bufford's job description as HR recruiter states that Bufford was responsible for "fill[ing] all job openings[]" and "assur[ing] fair compensation practices[.]" Hantz's affidavit confirms Bufford's authority to recommend Top Deck employees for certain job assignments. This ability to fill job openings and recommend

employees to projects gave Bufford a degree of control over who filled the job openings and also affected how much they worked. Bufford accordingly could have been considered a supervisor under the *Vance* standard. *See id.* This evidence constitutes more than a scintilla of evidence that Bufford was a supervisor and therefore is sufficient to raise a fact issue on this point. *See* Tex. R. Civ. P. 166a(i).

Top Deck concedes that Bufford sent Simmons several text messages requesting pictures of her breasts in July 2019. However, Simmons testified that she does not know the dates of the voluntary exchanges of text messages of a sexual nature between her and Bufford and those text messages themselves are not dated. Simmons testified that her cell phone "got smashed" and was accidentally destroyed after she retrieved and emailed several selected text messages of a sexual nature to her lawyer a couple of weeks before July 30, 2019. In her deposition, Simmons was unable to say when the text messages of a sexual nature were exchanged saying "I don't know what date he was texting me dude or whatever." But she indicated that she talked to a friend who suggested she talk to a lawyer shortly after she and Bufford exchanged the text messages. She further testified that she talked to her lawyer a couple of weeks before July 30, 2019. Bufford's recollection is that the text messages of a sexual nature were made some time in July 2019 after the June 10, 2019 date that Simmons had failed to show up for her one-day assignment Bufford had scheduled for her to work at Evadale. Simmons stated in her deposition that she did

23

not show up for her work assignment at Evadale on June 10, 2019, because she had decided she was not going to work for Top Deck anymore:

Q. But after June -- after June 11th you weren't really trying to get a job, were you?

A. Well, I mean, at that time in my life I was willing to just work whatever, you know.

Q. Well, but you've already told me repeatedly that if Top Deck had offered you a job you weren't going to show up.

A. Right.

Even after viewing this evidence in the light most favorable to Simmons, there is no indication that the text messages of a sexual nature that were exchanged between Simmons and Bufford were related to Buford's failure to offer Simmons work or that they were related to Simmons's decision to terminate her employment on June 10, 2019. Therefore, there is no evidence of quid pro quo sexual harassment based upon the evidence provided by Simmons in support of her quid pro quo harassment claim. *Ellerth*, 524 U.S. at 761 (a tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits). The text messages which definitely contained sexual content which may indeed have been inappropriate resulted in no significant changes in the job assignments because the evidence demonstrates the text message conversations occurred after Simmons had already decided she was never going to

24

work for Top Deck and were after she stopped working for Top Deck. Even though Simmons claims a causal connection between the text messaging and her assignments, the undisputed evidence was that Bufford offered her yet another assignment after June 11, 2019, and after the allegedly offensive text messages, but Simmons failed to appear a second time for that assignment. Therefore, there is no evidence that Simmons was adversely affected in her employment because of the sexual text messaging. *Id.*

To the extent that Simmons contends she was not assigned work because she claims that, in her second and final personal meeting with Bufford on or about April 4, 2019, he asked her about her breasts in person and whether they were real, the claim is also unsupported by the evidence. Assuming the statements were made to her, Simmons was immediately sent on a fire watch/hole watch job in Evadale and was assigned steady work through April and into the month of May when the temporary job terminated. Therefore, even if Bufford made the statements Simmons claimed, there is no evidence that the statements adversely affected her assigned work and standing alone those allegations cannot constitute an adverse employment action. *Id*. Simmons claims that Bufford failed to assign her to jobs in DeRidder, Louisiana, and that was an adverse employment action, but the evidence shows that Bufford told Simmons that he assigned "the first 5 I'd heard from recently[.]" Buford also expressed concerns that, at that time, he did not know whether she had

25

permission from her probation officer to leave the state and go to Louisiana. Finally, the evidence shows that the DeRidder assignments were done before the text messaging incidents and could not be caused by or related to those messages. Simmons has failed to establish a genuine issue of material fact that there was an adverse employment action and she failed to meet the essential elements of a quid pro quo claim.

### IV. Hostile Work Environment Harassment

As set forth above, the Texas Labor Code and applicable case law prohibit harassment that creates a hostile work environment. *See* Tex. Lab. Code Ann. § 21.051; *see also Fossil Grp., Inc. v. Harris*, 691 S.W.3d 874, 880–81 (Tex. 2024).

### A. Applicable Law

Evidence of a hostile work environment consists of evidence of the following elements: "(1) [the] employee was subjected to unwelcome sexual harassment, (2) the employee was harassed because of his or her sex, (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile work environment, and (4) some basis exists for holding the employer liable." *Fossil Grp.*, 691 S.W.3d at 880–81. *Faragher*, 524 U.S. at 780 (holding an employer vicariously liable for sexual harassment by a supervisor, subject to certain defenses). In *Faragher*, the Supreme Court specifically held:

> [We] adopt the following holding in this case and in *Burlington Industries, Inc.* v. *Ellerth*, *ante*, p. __, also decided today. An employer

26

is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Id.* at 807–08.

The *Faragher* defense provides that, in cases where there is no adverse employment action, an employer may avoid liability for alleged sexual harassment from a hostile work environment if the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior and the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Id.* at 807. Employer liability may still arise from the employer's negligence if it knew or

27

should have known of the harassment and "fail[ed] to take prompt remedial action to stop it." *Fossil Grp.*, 691 S.W.3d at 881 (citations omitted).

## B. Analysis

We found as explained above that Ms. Simmons failed to establish she experienced an adverse employment action related to the alleged sexual comments or text messages. That said, we now turn to whether Top Deck has established its affirmative defense under the holding in *Faragher*. *See Faragher* at 807–08. The first prong of the two-prong test is whether the employer took reasonable care to prevent and correct promptly any sexually harassing behavior by having a policy and procedure in place to prevent it. *Id.* The undisputed evidence shows that Top Deck had a clear policy in place, that was acknowledged by Simmons, identifying, and prohibiting sexual harassment. Simmons acknowledged that she was aware of the policy. This evidence meets the first prong of the Faragher test so that both the employer and the employees are engaged in preventing sexual harassment. *Id.* at 808.

Since Top Deck had a policy in place which was required to be reviewed and understood by each employee and supervisor, under the second prong of *Faragher*, if the employee feels there is a hostile environment, the employee should make a report to the employer through proper channels. Top Deck's employee handbook specifically stated that the employee should report complaints of sexual harassment

to the harassing party, or the immediate supervisor, or to the Human Resources Department. The phone number for the Human Resources Department was included in the written document. In addition, Simmons's immediate supervisor, as she acknowledged, for the entire time she worked jobs for Top Deck was Chris Hantz. She agreed that she had his cell phone number from her first day on the job site. She acknowledged that virtually every morning briefing at the jobsite Mr. Hantz told the employees that, if they had any problems, to call his cell phone and she never called him or spoke to him about the sexual harassment. Simmons admitted she never contacted Human Resources to make a complaint against Bufford for sexual harassment even though she knew, from prior experience, that it was the proper procedure she should undertake if there was sexual harassment. Simmons admitted she never complained to Bufford that he was sexually harassing her, nor told him to stop. In fact, she engaged in and even initiated sexually inappropriate remarks and banter with Bufford in July 2019—nearly one month after she had already decided she was not going to work there and had failed to show up for assigned work on two occasions. Based upon the *Faragher* affirmative defense, as pleaded by Top Deck, and the failure of Simmons to rebut the defense, there is no genuine issue of material fact that Simmons failed to bring a complaint of sexual harassment, if she considered it such, to the attention of anyone at Top Deck. *Id.* Accordingly, the trial court did

not err in granting summary judgment for Top Deck. We overrule Simmons's appellate argument as to the *Faragher* affirmative defense.

## V. Retaliation

As with quid pro quo and hostile work environment harassment, it is an unlawful employment practice to retaliate against a person who opposes a discriminatory practice or otherwise exercises his or her rights under the Texas Commission on Human Rights Act. *See* Tex. Lab. Code Ann. § 21.055(1).

## A. Applicable Law

A successful retaliation claim includes evidence of the following three elements: (1) the employee engaged in an activity protected by the Texas Commission on Human Rights Act, (2) the employee experienced a material adverse employment action, and (3) the adverse employment action is causally linked to the protected activity. *See Alamo Heights Indep. Sch. Dist*., 544 S.W.3d at 782 (listing elements of a retaliation claim). To show causation, "the employee must show that the decisionmaker responsible for the discriminatory act knew of the employee's previous complaints and was motivated by the making of those complaints." *Ibezim v. Tex. Dep't of Health*, No. 03-03-00308-CV, 2004 WL 1574488, at *6 (Tex. App.—Austin July 15, 2004, no pet.) (mem. op.) (citation omitted). "'[P]rotected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue.'" *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d

572, 586 (Tex. 2017) (quoting *Brown v. United Parcel Serv., Inc.*, 406 F. Appx. 837, 840 (5th Cir. 2010)).

## B. Analysis

In Simmons's Response to the Motions for Summary Judgment and in her appellate brief, Simmons contends that by refusing Bufford's requests, she opposed his discrimination and thereby engaged in protected activity. Top Deck, conversely, argues that Simmons did not oppose discrimination, as "oppose" is contemplated by the TCHRA, because she admittedly did not tell either Bufford or Top Deck management that Bufford's comments were unwelcome. We agree with Top Deck.

Simmons's reliance on *Crawford v. Metro. Gov't of Nashville* is misplaced. *See* 555 U.S. 271, 277 (2009) (discussing the meaning of "oppose"). We do not read *Crawford* to say that silently opposing discrimination is sufficient to constitute protected activity. *See id.* Instead, *Crawford* requires a degree of activity, rather than inactivity, to oppose discrimination under the TCHRA. *See id.* at 276. The *Crawford* court approvingly cited the dictionary definition of "oppose" as meaning "[t]o resist or antagonize . . .; to contend against; to confront; resist; withstand[.]" *Id.* at 276 (citation omitted). Indeed, as explained in *Faragher*, the purpose of the legislation was to establish a framework which would encourage employers to proactively act to prevent discrimination in the workplace by establishing policies for discovering and rectifying any such discriminatory acts immediately and within the confines of

the immediate situation. *See Faragher* at 807-08. Simmons' admissions that she never attempted to report any sexual harassment, if it occurred, undermines the intent of the law as designed. In this case, Simmons's behavior mitigates against her claims of retaliation.

Even viewing Simmons's responses to Bufford's comments in the light most favorable to her, we do not equate Simmons's failure to send Bufford a photograph of her chest as her effort to "oppose" the harassment as that term is contemplated in *Crawford*. *See Crawford* at 276. Additionally, the evidence in the record shows Simmons willfully participated in the sexual banter by sending her own text messages to Bufford.

Simmons did not oppose Bufford's alleged harassment within the meaning of the TCHRA. *See* Tex. Lab. Code Ann. § 21.055(1). Having determined that Simmons did not raise a fact issue as to one element of her retaliation claim, we need not address the remaining elements of retaliation. Tex. R. App. P. 47.1.

We overrule Simmons's appellate argument as to retaliation.

## VI. Conclusion

Simmons failed to raise a genuine issue of material fact sufficient to defeat Top Deck's Amended Traditional and No-Evidence Motion for Summary Judgment as to Simmons's quid pro quo and hostile work environment harassment claims, as

well as her claim of retaliation. The trial court did not err in granting the summary judgment and the judgment of the trial court is therefore affirmed.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on July 27, 2023
Opinion Delivered December 12, 2024

Before Golemon, C.J., Johnson and Wright, JJ.